**Robert C. WHITE, Appellant,**

v.

**FRATERNAL ORDER OF POLICE,
et al., Appellees.**

**No. 89–7079.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1990.

Decided July 13, 1990.

Rehearing and Rehearing En Banc
Denied Sept. 19, 1990.

**514**

Peter E. Derry, with whom John J. Pyne, Chevy Chase, Md., was on the brief, for appellant.

Cameron Cohick, with whom Dennis A. Davison, Washington, D.C., was on the brief, for appellee, Fraternal Order of Police.

Kevin T. Baine, with whom David C. Kiernan and Betsy K. Wanger, Washington, D.C., were on the brief, for appellees, The Washington Post and Nat. Broadcasting Co., Inc.

Before WALD, Chief Judge, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Robert C. White appeals a grant of summary judgment in favor of the defendants. 707 F.Supp. 579. White, a Captain in the Washington, D.C. Metropolitan Police Department ("MPD") sued the appellees, the Fraternal Order of Police ("FOP"), The Washington Post Company ("the Post"), and National Broadcasting Company, Inc. ("NBC") for invasion of privacy and defamation. Each appellee published statements about a controversy generated when White underwent a routine drug test required for his promotion from Lieutenant to Captain. Among other items, the appellees published the true facts that White's first urine sample initially tested positive for marijuana and that a second urine sample, which was taken and transported under irregular circumstances, tested negative.

Because we find that the publications at issue involved a legitimate matter of public concern—the fitness for office of a public official and possible improprieties in police drug testing—we hold that White's claims of injury from publication of "private facts" must fail.

We also uphold the district court's determination that no defamation or "false light" claims could succeed against the media defendants—the Post and NBC—because their publications were not capable of bearing a defamatory meaning or placing White in a false light. Alternatively, we hold that the Post was protected by a privilege to publish fair and accurate reports on governmental proceedings. NBC, however, does not enjoy the benefit of this alternative holding because it broadcasted a report reflecting the gist of the charges investigated in the governmental proceeding without ever attributing any of the stated facts to the proceeding. We decline to decide whether media defendants enjoy a First Amendment privilege of neutral reportage because it is not essential to reach this issue in order to resolve the claims against the Post and NBC. We affirm the grant of summary judgment to the media defendants on all counts.

We reverse, however, the award of summary judgment for the FOP on the defamation and "false light" invasion of privacy claims. The FOP sent letters to the U.S. Attorney and the Mayor of the District of Columbia, reporting apparent procedural irregularities in the MPD drug testing program that warranted an investigation; the MPD subsequently conducted such an investigation. The letters, however, contained material capable of defamatory meaning, namely, that White was a candidate for a high position in the MPD who had used an illegal drug and had engaged in bribery to ensure his promotion. Therefore, a jury is responsible for determining whether the letters actually conveyed a defamatory meaning and whether White can establish the other elements of defamation and "false light" invasion of privacy. We hold that the FOP enjoys only a qualified privilege, *inter alia,* to report the alleged misconduct of a police officer to his superiors, *Mosrie v. Trussell,* 467 A.2d 475 (D.C.1983), and that the jury must determine whether the FOP overreached this privilege because malice fueled its actions.

## I. BACKGROUND

In April 1985, then-Lieutenant White was nominated for promotion to Captain in the MPD and required to pass a physical exam, including a urine test for drugs. White submitted a urine sample to the Police and

Fire Department Clinic. There, the sample was subjected to an Enzyme Multiple Immunoassay Test ("EMIT test"), which showed a positive result for marijuana. The standard operating procedure when an EMIT test showed a positive result was to forward the urine sample to the CompuChem laboratory in North Carolina for confirmation of the initial result. Instead, White was notified of the positive result and brought back to the Clinic to submit a second sample.

The next day, White's original and second urine samples were hand-carried by a member of the MPD to the CompuChem lab in North Carolina. Such hand-delivery by a member of the MPD was also a departure from normal procedures as was the testing of the second sample by CompuChem without first subjecting it to an EMIT test at the Clinic. The CompuChem lab found both samples to be drug-free. White was promoted to Captain, and later became head of the Department's narcotics squad.

In 1987, some two years after White's EMIT test, two employees of the Police and Fire Department Clinic, Mrs. Marguerite Anastasi and Officer Vernon Richardson, contacted the FOP, informing it of the results of White's tests and the irregularities in the conduct of the tests. As a result, the FOP's attorney reported the allegations to the U.S. Attorney, Joseph DiGenova, by letter dated July 15, 1987. The Chairman of the FOP sent a second letter, dated July 28, 1987, reporting the allegations to Mayor Marion Barry. The two letters, which were virtually identical, concluded with attestations of truth signed by Anastasi and Richardson.

After describing the irregular procedures employed for White's drug tests, the letters stated that Lieutenant Noyes, the Administrative Lieutenant at the Clinic, said to Richardson: "I am giving you a direct order not to tell anyone about what went on." The letters also reported that Lieutenant Noyes accompanied White to the men's room when he gave his second urine sample, that the urine samples were removed from the clinic and returned later

the same day by an officer who normally would not handle urine samples, and that the top lock on the laboratory door was then left unsecured overnight before the samples were sent to CompuChem.

The letters stated that the EMIT test on the first urine sample indicated a high level of cannabinoids that "should easily have been confirmed" by the CompuChem lab, and that it was "highly unusual" for such a result not to be confirmed. The letters concluded:

> Officer Richardson and Mrs. Anastasi are convinced that there is a systematic effort to subvert the integrity of the drug testing procedures at the Police and Fire Clinic and to manipulate the procedures so that desired results can be obtained.

After citing the "known involvement of [high ranking police] officials in the May 1985 incident involving Captain White," the letters continued:

> [I]t appears that drug testing procedures have been subverted to protect one and possibly more MPD officials from the results of positive urinalysis tests.... If the system has been corrupted, the ramifications are wide-spread. If records have been falsified, false statements made, or testing procedures subverted for gain (such as promotion), it is likely that criminal as well as ethical violations have been committed. [Footnote]

The footnote following this passage stated:

> Possible statutory violations include 18 U.S.C. Section 201 (bribery); D.C.Code Sections 22–712 (bribery); 22–723 (tampering with physical evidence); and 1–619.1 (standards of conduct).

In response to the FOP letter, Mayor Barry referred the matter to the Chief of Police, Maurice Turner, who in turn created the "Cox Committee," headed by Assistant Police Chief Ronal Cox, to investigate the matter. After extensive investigation, the Committee issued a report to Chief Turner in December 1987. The Cox Committee found that the police officials had deviated from standard operating procedures and noted "that it was readily foreseeable that

taking the second sample would generate the very suspicion that it has that favoritism, in the form of special attention or something worse, was being shown to a police official." The Committee concluded, however, that there had been no tampering with the specimens. As a result of these findings, the Police Chief reprimanded several high level officials not including White.

On August 25, 1987 and on eight occasions thereafter, the Post published articles concerning the FOP's allegations and the Cox Committee's investigation of those allegations. None of the Post articles mentioned Captain White by name and his picture was never shown. The August 25 article, however, identified White's rank and assignment, noting that after the drug tests "[t]he Lieutenant received his Captain's bars and became commander of the department's narcotics branch and later served on the department's Adverse Action Panel, which decides whether to fire police officers who have tested positive for drugs."

On September 28, 1987, NBC's WRC–TV (Channel 4) broadcasted a report which mentioned White by name and displayed his photograph. Pat Collins delivered the report on location in front of the Police and Fire Clinic. Using dramatic intonation, Collins presented an account of the questionable handling of White's drug tests. Collins' facts were essentially the same as those presented in the FOP letters, but he did not attribute the facts to the letters or the Cox Committee investigation. Upon completion of the report, the broadcast cut to anchorman Jim Vance in the studio who offered a terse conclusion: "A three-man task force assigned to investigate the matter is expected to issue a report soon."

White filed suit against each appellee, alleging that the publications invaded his privacy and defamed him by implying falsely, *inter alia*, that he was a drug user. Appellees moved to dismiss the complaint for failure to state a claim upon which relief could be granted and sought a stay of discovery. The court ordered a stay of discovery over White's objection and decided that the motions should be considered as motions for summary judgment.

On February 16, 1989, the district court granted summary judgment on all counts for the defendants. The court held that the invasion of privacy claims could not be sustained because the public had a legitimate interest "in knowing whether normal drug testing procedures were subverted to protect a high-ranking police official who was subsequently assigned to be the head of the Police Department's narcotics squad." The court rejected the defamation claims by reasoning, first, that the published statements were true and incapable of bearing any false and defamatory meaning; and second, that the statements were privileged.

## II. Discussion

### A. Standards for Summary Judgment and Stay of Discovery

■ Under Federal Rule of Civil Procedure 56(c), summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Thus, the Rules impose a two-pronged standard: summary judgment must be awarded where (1) there is no genuine issue of material fact and (2) such judgment is required as a matter of law. When considering motions for summary judgment, courts must view the facts and the inferences to be drawn from the underlying facts in the light most favorable to the opposing party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

White charges that the district court committed reversible error when it ordered a stay of discovery. He relies on Federal Rule of Civil Procedure 56(f), which states that a court "may refuse" applications for summary judgment when the party opposing the motion "cannot for reasons stated

present by affidavit the facts essential to justify" his or her opposition. In such circumstances, the court may refuse summary judgment or may, *inter alia,* order a continuance permitting discovery. Fed.R. Civ.P. 56(f). White asserts that summary judgment should not have been ordered because he was placed in an "impossible position" in opposing the summary judgment motions "[s]ince all of the facts surrounding the several defamatory publications are in the sole possession of the defendants." Perhaps because the contents of the FOP letters, the Post articles, and the NBC broadcast were available to White, the only issue which he specifically contends warrants discovery is actual malice. But even as to malice, White asserts "that there is already enough evidence to create a factual question" on this issue.

■ The district court ordered the stay pursuant to the FOP's motion for a protective order. Clearly, the decision whether to stay discovery is committed to the sound discretion of the district court judge. *See* Fed.R.Civ.P. 26(c) ("the court ... may make any order which justice requires"); Fed.R.Civ.P. 56(f) ("the court ... may order a continuance to permit ... discovery ... or may make such order as is just"). Therefore, we would reverse the district court's decision to stay discovery only if we found that the court had abused its discretion. White's submissions fall far short of this threshold. Because we find that the record is adequate to determine whether the standards for the grant of summary judgment are met in this case, we conclude that the district court did not err by staying discovery prior to issuing the summary judgment rulings.

We turn then to apply the standards for summary judgment to White's case.

### B. *Invasion of Privacy*

■ White contends that there was sufficient evidence for the court to present his invasion of privacy claims to the jury. He offers two theories for recovery: publication of private facts, and false light publicity. In the District of Columbia, to recover on the first theory, a plaintiff must show that the defendant (1) published private facts (2) in which the public has no legitimate concern and (3) which publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. *Dresbach v. Doubleday & Co., Inc.,* 518 F.Supp. 1285, 1287 (D.D.C.1981).

White concedes that publications relating to irregularities in the drug testing procedures are matters of public concern, but argues that the letters and news reports exceeded this permissible area by detailing the private facts of his situation. Appellees reply that drug use or the administering of tests to detect drug use among police officers can never be regarded as mere "private" facts. Even if the matter did reveal private facts, appellees contend that the possibility that a high-ranking police officer used drugs—or was involved in a coverup of this matter—was squarely a matter of public concern. We agree.

White concedes that under the relevant case law he is a public official. The public's interest "extends to 'anything which might touch on an official's fitness for office.'" *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–45, 94 S.Ct. 2997, 3009–10, 41 L.Ed.2d 789 (1974) (citation omitted). We think it axiomatic that personal drug use is relevant to fitness for public office, especially for officials charged with enforcing the law. The Supreme Court has suggested that law enforcement officers who use drugs may display impaired perception and judgment, indifference to the mission of drug enforcement, and even vulnerability to corruption or complicity with the drug trade. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 1393, 103 L.Ed.2d 685 (1989). Moreover, with public officials, "the legitimate interest of the public ... may include information as to matters that would otherwise be private." *Restatement (Second) of Torts* § 652D, comment e (1977). The specter of officials who swear to uphold and enforce the law as they break and compromise the law is one that has plagued our democracy.

■ White also claims a statutory right to privacy based upon D.C.Code

§ 1–616.2. That provision, subject to certain exceptions, restricts District of Columbia government employees from disclosing an individual's medical reports. Employees may, however, disclose "information concerning illegal or unethical conduct which threatens or which is likely to threaten public health or safety." *Id.* In any event, this provision does not apply to persons other than District employees. It does not restrict the press or the FOP and it does not purport to set standards governing when private medical information becomes a matter of public concern.

For the reasons stated, we conclude that all appellees were entitled as a matter of law to summary judgment on the claim for invasion of privacy due to publication of "private" facts.

White also contends that the Post and NBC reports placed him in a "false light." The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view. Yet, truth or assertion of opinion are defenses in both causes of action. *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983). In addition, the same privileges applicable to libel claims may be invoked to defend false light claims. *See Restatement (Second) of Torts* § 611, comment b (1977); *id.* § 652G. For these reasons, we will address the false light claims in tandem with the defamation claims.

### C. *Standards for Defamation by Implication*

■■■ In an action for defamation, the courts are charged with the responsibility of determining whether a challenged statement is "capable of conveying a defamatory meaning." *Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.,* 877 F.2d 1010, 1013–14 (D.C.Cir.1989). If, at the summary judgment stage, the court determines that the publication is capable of bearing a defamatory meaning, a jury must determine whether such meaning was attributed in

fact. *Id.* Under District of Columbia defamation law, which governs this diversity case, a court's power to find that a statement is not defamatory as a matter of law is limited:

> It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.

*Levy v. American Mutual Ins. Co.,* 196 A.2d 475, 476 (D.C.1964). Generally, a publication may convey a defamatory meaning if it "tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates." *Afro–American Publishing Co. v. Jaffe,* 366 F.2d 649, 654 n. 10 (D.C.Cir.1966) (citations omitted).

This case draws us into an area fraught with subtle complexities: the law of defamation by implication. A defamation by implication stems not from what is literally stated, but from what is implied. *See Tavoulareas v. Piro,* 817 F.2d 762, 780 (D.C. Cir.1987) (en banc); *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (use of the term "set up" in a familial context implied that one family member provided an opportunity to another family member on the basis of kinship, not merit); *see generally* R. Smolla, *Law of Defamation,* § 4.05 (1990). Adding to the complexity of this case is the fact that the reports at issue contain materially true accounts of what transpired. This court has recognized, however, that "District of Columbia law ... clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report." *Southern Air Transport,* 877 F.2d at 1014; *see also McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 717 F.2d 1460, 1465 (D.C.Cir.1983) (true statement that an expert witness received $5,000 a day might support an implied defamatory meaning that the plaintiff's testimony was "for sale").

White concedes that much of the information published in the FOP letters and

provided in the news reports · was true. The core theory underlying his defamation claims is that even concededly accurate information is capable of bearing a defamatory meaning. He asserts that the FOP letters were defamatory by implication and that the respective news reports effected defamation by the omission of certain crucial facts. Before evaluating these claims, we set out our understanding of the law of defamation by implication as applied to materially accurate news reports.

In entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning. The difficulty lies in applying a standard that has both subjective and objective components:

> The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory sense. . . . When one uses language, one is held to the construction placed on it by those who hear or read, *if that construction is a reasonable one.*

F. Harper, et al., *The Law of Torts* § 5.4 (1986) (emphasis added). Under this standard, in order to prevail on a defamation claim, the language used must, as a matter of law, be reasonably capable of a defamatory interpretation and a jury must find that the language was actually understood by the recipient in that sense. It is no defense that the defendant did not actually intend to convey ·the defamatory meaning, so long as the defamatory interpretation is a reasonable one. At bottom, "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Restatement (Second) of Torts* § 563 (1977); *see also id.* comment c.

Application of this general standard becomes even more difficult where the reported facts are materially true and the alleged defamation is not stated explicitly. If the speaker or author has not uttered the alleged defamation explicitly, how is the court to discern whether it would be reasonable to understand the alleged defamatory meaning to have been intended? We believe it is possible to extract a standard from the cases addressing the defamatory character, *vel non,* of materially true reports.

In *McBride,* we held that the true statement that Dr. McBride received $5,000 a day for his expert testimony might support the implied defamatory meaning that "the plaintiff's case was so weak they had to pay that much to get any expert to testify, and hence that Dr. McBride's testimony was for sale." 717 F.2d at 1465. That implied defamatory meaning arose not out of mere reporting of the $5,000 payment, but from the *juxtaposition* of that figure with the fees which the defendant normally paid such experts. The *McBride* court noted this direct comparison. *Id.* The publication read:

> "These expert witnesses included William McBride ... who was paid $5,000 a day to testify in Orlando. In contrast, Richardson–Merrell pays witnesses $250 to $500 a day, ·and the most it has ever paid is $1,000 a day."

*Id.* at 1462.

In *Southern Air Transport,* we considered whether a factually accurate report—that Southern Air used planes owned by a South African cargo company to transport arms to a Contra base in Central America—was reasonably capable of conveying the defamatory implication that Southern Air was in partnership with the South African government. 877 F.2d at 1014–15. In particular, the court considered whether the juxtaposition of visual graphics and commentary could imply the defamatory meaning. The court noted that the phrase "South Africa Connection" was emblazoned not on the portion of the film showing the Southern Air plane, but over a different segment designed to emphasize alleged clandestine dealings between the CIA and the South African government in support of the Contras. While with only a little imagination a viewer might infer that Southern Air was part of the "South Africa Connection," the court held that nothing in

the defendant's specific treatment of Southern Air suggested that it was reasonable to impute such a meaning to the broadcasts. *Id.* at 1015–16.

One of our sister circuits offers a more cogent example of the limits of defamation by implication regarding materially true reports. In *Janklow v. Newsweek, Inc.,* the Eighth Circuit held that a report of the true fact of a 14–year–old's rape allegation was not capable of bearing the defamatory meaning that Janklow was actually guilty of the alleged rape, even though the report omitted the facts that (1) Janklow had passed a lie detector test; (2) the alleged victim had been declared "untestable" because of her emotional display during her polygraph exam; (3) a medical exam showed no signs of rape; and (4) numerous federal authorities had called the rape allegations unfounded. 759 F.2d 644, 648–49 (8th Cir.1985), *reheard on other grounds,* 788 F.2d 1300 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

█ These three cases—*McBride, Southern Air,* and *Janklow* —suggest that if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

In *McBride,* the author's juxtaposition of two classes of expert fees supplied the affirmative evidence rendering it reasonable to impute a defamatory meaning to the publication. If in *Southern Air Transport,* for example, the "South Africa Connection" graphic had been superimposed over the footage of Southern Air's plane, this most likely would have constituted affirmative evidence to justify imputing the defamatory meaning that Southern Air was in partnership with South Africa. In sum, the court must first examine what defam-

atory inferences might reasonably be drawn from a materially true communication, and then evaluate whether the author or broadcaster has done something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the inference. We emphasize that the tortious element is provided by the affirmative conduct of the author or broadcaster, although it is immaterial for purposes of finding defamatory meaning whether the author or broadcaster *actually* intends or endorses the defamatory inference.

White argues that a defamation may also be accomplished by an omission of material facts. In other words, he asserts that the court should consider extrinsic evidence beyond what is stated in the actual communication in evaluating potential defamatory meaning. We disagree, however, with White's interpretation of the only authority he offers in support this proposition. In *Memphis Publishing Co. v. Nichols,* the Supreme Court of Tennessee found a defamatory meaning *not by looking at what was omitted* but from the "clear implication" of the text standing alone. 569 S.W.2d 412, 419 (Tenn.1978) ("the clear implication of the article is that Mrs. Nichols and Mr. Newton had an adulterous relationship and were discovered by Mrs. Newton, thus precipitating the shooting incident.") The court later referred to material omissions in examining whether the defendant should be allowed the affirmative defense of truth because everything that was published was true in the literal sense. Defamatory meaning and falsity are distinct elements of the tort of defamation and are considered separately. In *Memphis Publishing,* the omissions were not used to establish defamatory meaning, but they demonstrated the falsity of the defamatory meaning which the report was found capable of bearing. *Id.* at 420.

*Memphis Publishing* suggests that the omission of material facts might in some circumstances supply the missing ingredient that would place a literally true communication in the field of implied defamation. However, because we need not

decide whether omissions are relevant to establishing defamatory meaning in order to dispose of this case, we leave the delineation of that issue for another day. We turn to apply the standards for defamation by implication to the facts of this case. Because the arguments and privileges applicable to the FOP differ from those applicable to the media defendants, we address the FOP separately.

### D. *The FOP*

1. The FOP—Defamation and "False Light"

■ White's allegations of defamation regarding the FOP letters compress essentially to two claims: (1) that the letters accuse him of having used illegal drugs, and (2) that the letters accuse him of securing his promotion through bribery. (White also alleges that the letters accuse him, as a member of the MPD's Adverse Action panel, of hypocritically sitting in judgment of other police officers whose urine tested positive for drugs. Because the latter claim was not raised or discussed below, we decline to address it here.)

To support his claim that the FOP letters falsely imply that he used illegal drugs, White relies primarily on two statements contained in the letters. First, the letters accurately state that his EMIT test was positive. Second, they state that White's EMIT result "should easily have been confirmed" by CompuChem because of the high level of cannabinoids shown by the EMIT test. White contends that the letters also should have noted that the EMIT test (allegedly) had an accuracy rate of only five percent during the six-month period preceding his own drug-screening test. To support his claim that the letters accuse him of bribery, White relies on the closing reference in the letters to possible criminal violations that may have been committed.

The district court held that the letters were not actionable, *inter alia*, because none of the statements mentioned above were capable of a defamatory meaning. We disagree. Applying the test outlined above for defamation by implication, we conclude that the FOP letters go beyond

merely reporting materially true facts. Those facts—that White's EMIT test was positive, that it reflected a high level of cannabinoids, that both samples were not handled according to official procedures, that both samples tested negative at CompuChem, and that White later received his promotion—might lead a reader to infer that White used an illegal drug and that he was involved in the subversion of official procedures for his own personal gain. The reporting of these facts, standing alone, is not sufficient to render the letters actionable. The letters supply additional evidence, however, to make it reasonable for a reader to impute defamatory meaning to the letters. In addition to reporting the irregular circumstances surrounding White's drug tests, the letters note that the high level of cannabinoids registered by the EMIT test "should easily have been confirmed" when the sample was tested by the CompuChem lab. This assertion renders colorable the inference that White used marijuana, and is at least as suggestive as was the juxtaposition of the disparate witness fees in *McBride*.

The FOP letters also do more than merely present the facts supporting an inference that White played an improper role in the irregularities surrounding his drug tests. By raising the specter of criminal violations, including bribery, the FOP provided a clear signal from which a reader could conclude, rightly or wrongly, that the defamatory inference was intended or endorsed. The letters invoked the word "bribery" in a context that could only be understood to apply to White; it referred to the subversion of testing procedures "for gain (such as a promotion)" immediately before citing the bribery statutes. In the entire letter, the only person discussed who received a promotion and for whom testing procedures were subverted was White.

We reject White's suggestion that the FOP was *obliged* to state in the letters that the EMIT test had only a 5% accuracy rate, because nothing in the record conclusively supports this assertion. White relies on an Internal Affairs Division ("IAD") report,

written two years before the FOP letters were sent, which found that in the six months prior to White's EMIT test, only one of 18 EMIT results that were positive for marijuana was confirmed upon retesting by CompuChem. While the IAD report calls into question the accuracy of the equipment used to conduct the EMIT tests, it does not conclude that the EMIT test was only 5% accurate. The IAD study outlines concerns about diversions from standard procedures and underscores the uncertainty surrounding the extent of irregularity in the testing program at the time White's test was taken. Without reaching the question of whether omissions can give rise to a cause of action for defamation, we hold that none of the appellants in this case can be charged with knowledge of the accuracy rate of the EMIT test because that rate was uncertain.

 White also claims that the FOP letters invaded his privacy by exposing him to false light publicity. The Restatement (Second) of Torts § 652E (1977) defines this tort as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his [or her] privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

White alleges only that "the FOP letters portrayed [him] in a false light by stating that non-confirmation of [his] first test was highly unusual when FOP knew, at the time the letters were written, that 95% of positive test results at the Clinic in the six months immediately preceding plaintiff's test were erroneous." Although we have ruled that the FOP cannot be charged with knowledge of the accuracy rate of the EMIT tests, we cannot conclude, as a matter of law, that the FOP's assertions as to the confirmability of his first test did not place him in a false light. Again, those

assertions render it reasonable for a reader to infer that White used an illegal drug. We have no doubt that it would be highly offensive to a reasonable person to be placed in this light. As with the defamation count, a jury must be allowed to determine whether this impression is false.

Because the letters, viewed in their entirety, are thus capable of bearing implied defamatory meanings and of placing White in a false light, we proceed to discuss whether any of the statements in the FOP letters are privileged or protected as expressions of opinion.

## 2. The FOP—Opinion

The Supreme Court recently revisited the issue of First Amendment protection for expressions of opinion. It established that a statement of opinion having no provably false factual connotation is entitled to full constitutional protection but that the First Amendment does not carve out an absolute privilege for assertions of opinion. *See Milkovich v. Lorain Journal Co.,* — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Specifically, the Court rejected the practice, developed by lower courts, of applying a strict dichotomy between assertions of fact and assertions of opinion in determining the scope of First Amendment protection. *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Assertions of opinion on a matter of public concern only receive full constitutional protection if they do not contain a provably false factual connotation. *Milkovich,* 110 S.Ct. at —. In other words, even with a *per se* opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts. The test is intended to protect the use of "loose, figurative or hyperbolic language" which would preclude an impression that the author was seriously maintaining a provable fact. *Id.*

The defamatory meanings which we have found the letters capable of bearing are that White used illegal drugs and that he was involved in illegal conduct—bribery—

to secure his promotion. Nowhere do the letters directly express assertions to this effect; rather the defamatory meanings are derived by implication. What the district court and the FOP apparently fail to understand is that it is the defamatory *implication*—not the underlying assertions giving rise to the implication—which must be examined to discern whether the statements are entitled to full constitutional protection. Prosser makes this clear in discussing defamation by implication:

> [I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication ... he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

Prosser, The Law of Torts § 116, 5th Ed. (Supp.1988). *See also Okun v. Superior Court of Los Angeles County*, 29 Cal.3d 442, 175 Cal.Rptr. 157, 629 P.2d 1369 (1981) (finding in an action for libel by innuendo that the "implications deprecatory to plaintiff" were "mere opinion"); *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir. 1980) (evaluating whether "fair implications" which were defamatory would be protected as opinion). Although these authorities are premised on the old assumption that assertions of opinion are absolutely protected, they correctly focused on the aggregate defamatory implication, rather than each underlying assertion. *See also Milkovich*, 110 S.Ct. at —— (finding that nine sentences and a caption combined to "*imply* an assertion that Milkovich perjured himself" and the implication was sufficiently susceptible of being proved true or false to preclude First Amendment protection) (emphasis added). This approach is necessary because defenses are raised to negate that which renders the language actionable—the defamatory meaning. A defamation by implication, therefore, is not treated any differently than a direct defamation once the publication has been found capable of a defamatory meaning. A defendant may escape liability if the defamatory meaning is established as true or as constitutionally protected expression.

We turn, then, to evaluate whether the defamatory implications which arise from the FOP letters constitute protected expression. Patently, they do not. The assertions that someone used illegal drugs and that he engaged in illegal activity such as bribery—whether express or implied— are " 'articulation[s] of ... objectively verifiable event[s].' " *Milkovich*, 110 S.Ct. at —— (citation omitted). The context in which these implications arose, moreover, bolsters this common understanding. The FOP wrote the letters with the express purpose of prompting an investigation to validate or verify its allegations. Under these circumstances, we conclude that the defamatory implications are not entitled to constitutional protection under the First Amendment.

### 3. The FOP—Privilege

White concedes that the FOP letters were subject to qualified privilege. Under District of Columbia law, communications to superiors concerning alleged misconduct of a police officer are entitled to *qualified* privilege, *Mosrie v. Trussell*, 467 A.2d 475 (D.C.1983), while statements published incidental to judicial or quasi-judicial proceedings are *absolutely* privileged. *Mazanderan v. McGranery*, 490 A.2d 180 (D.C.1984). The district court suggested that the FOP was entitled to absolute privilege under *Mazanderan* but expressed reluctance to extend the absolute privilege "beyond the reach of decided case law." Because it found that the qualified privilege could not be defeated by a showing of malice, the district court rested its decision on the protection afforded by *Mosrie* and the common law qualified privilege of a libel defendant to act in his own interest. We hold that the FOP is only entitled to a qualified privilege.

The FOP asserts that the absolute privilege applied in *Mazanderan* is controlling because the letters were sent to the U.S. Attorney and the Mayor and they precipitated the Cox Committee's investigation, which the FOP claims was a quasi-judicial proceeding. In *Mazanderan*, a libel defendant wrote directly to the Public Vehicles

Division of the D.C. Department of Mass Transportation alleging abusive behavior by a taxi driver and requesting revocation of the driver's license. Because the letter constituted a formal complaint, resulting in a hearing by the Hacker's License Appeal Board, the court held that the communications in the letter were absolutely privileged. 490 A.2d at 181–82. White contends that the link between the FOP letters and the appointment of the Cox Committee is too tenuous for the letters to have been "published incidental to [quasi-]judicial proceedings" and that, in any event, the Cox Committee does not qualify as a "quasi-judicial" body.

*Mazanderan* provides little assistance in spelling out the limits of the "quasi-judicial" rubric. It notes only that the privilege has been extended to encompass quasi-judicial proceedings conducted by administrative bodies and private arbitration proceedings. *Id.* In both of the cases which the *Mazanderan* court cites, however, the decision-making body at issue appears to have had all of the trappings of an adjudicatory tribunal. *See Sturdivant v. Seaboard Service System, Ltd.*, 459 A.2d 1058 (D.C.1983) (arbiter held a prehearing conference with witnesses, conducted a formal hearing, and issued an "opinion" denying the grievance); *Bleecker v. Drury*, 149 F.2d 770 (2d Cir.1945) (New York Industrial Board issued opinions on workmen's compensation claims). *Bleecker*, which applied the privilege to an administrative body, is particularly instructive in describing "judicial" qualities:

> [T]he Board conducts hearings in which the admissibility of evidence is ruled upon by the ... officer presiding. It limits the rights of persons to appear before it and in substance observes a procedure akin to that of the courts of record of New York. It makes full and conclusive determinations of both questions of fact and law, and an appeal may be taken from its determination to an appellate court.

149 F.2d at 771.

The Cox Committee was a three-person, ad-hoc committee assembled by the Chief of Police solely to investigate the allegations contained in the FOP letter. The committee conducted an extensive investigation which involved interviewing 33 MPD employees, who were not placed under oath, and reviewing numerous documents. The report issued by the committee contains exhaustive "findings" as to each allegation of impropriety, but concludes that no illegal activity took place. It recommends specific improvements in testing procedures and concludes that the Police Chief should take "appropriate action" regarding persons the report identifies as having been responsible for irregularities. Initially, the Committee's full report was kept confidential, with only a summary being released for public consumption.

We conclude that the Cox Committee investigation was not sufficiently judicial in nature to warrant application of the absolute privilege afforded in *Mazanderan*. The Committee did not engage in traditional adjudicatory processes such as the holding of formal hearings and did not possess the power to issue a ruling that could be enforced or appealed. The only other case cited by the *Mazanderan* court on this issue suggests that policy considerations militate against absolute privilege in this case.

> Such special immunity is not lightly conferred ... as it protects deliberate lies told with intent to destroy reputation. Where dealing with preliminary statements other than witness briefings, settlement discussions and the like, there is a need for particularly close attention to the factual circumstances, recognizing that unlike statements made in court, these communications are not cabined by a litigant's recognition that contempt of a court may follow if they are outrageously unnecessary and intemperate, even though more or less relevant.

*Brown v. Collins*, 402 F.2d 209, 213 (D.C. Cir.1968).

■■ White may defeat the FOP's claim of qualified privilege if he can prove that the defamatory statements were made with actual malice, i.e., with knowledge that they were false or with reckless disregard

for whether they were false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Because White concededly is a public figure, malice is also an element of the defamation tort, *id.*, and, by definition, is part of the false light tort. Contrary to the district court's reasoning, malice cannot be deemed a legal impossibility at this stage because, on the record before us, we cannot establish the truth (or falsity) of the defamatory implications. Because we have found the FOP letters capable of defamatory meaning and false light publicity, a jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice.

E. *The Media Defendants—Defamation and "False Light"*

██ In essence, the only defamatory implication which White alleges vis-a-vis the media reports is that he is accused of using illegal drugs. He contends that the news reports falsely implied illegal drug use primarily because they omitted facts that would have precluded that defamatory implication.

1. The Post

The Post articles state that the initial test of White's urine sample tested positive for marijuana; that the police officials departed from standard procedure in taking a second sample; that other irregularities occurred such as the "hand-carr[ying] by a police officer on a plane to a lab in North Carolina;" that the second sample was reported free of drugs by the lab in North Carolina; and that White subsequently received his promotion and later served on "the department's Adverse Action Panel, which decides whether to fire police officers who have tested positive for drugs." All of these facts reflect the findings of the Cox Committee. White concedes that the facts reported were generally accurate, but he attacks the omission of the facts that the first sample was also sent to CompuChem and was not confirmed as drug-tainted, and that the "lab in North Carolina" was under contract to perform confirmato-

ry testing for all samples which tested positive at the MPD Clinic. These omissions, White contends, gave the initial EMIT result an aura of absolute reliability thereby creating a defamatory meaning. The seventh Post article did report that both the first and second samples were tested by CompuChem and that both were negative, but White contends that this could not cure the implications occasioned by the earlier omissions.

We find White's arguments unpersuasive. First, as we noted above, his reliance on *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn.1978), to establish a defamation by omission is misplaced. There, omissions were relevant only to establish falsity, not defamatory meaning. More importantly, we find that any omissions by the Post were immaterial because the same impressions would have been created if the omitted material had been included. If all of the articles had mentioned that CompuChem did not confirm the EMIT results on the first sample, a reader who concluded that the second sample had been tampered with would no doubt draw the same conclusion as to the first sample because the report of mishandling would apply to both samples. Moreover, even if this court were to fully define a tort for defamation by omission, leaving out the unreported material did not create a substantially inaccurate portrait of the facts at hand, as was the effect in *Memphis Publishing*. Newspaper reporters should not be required to report the results of investigative journalism with a precision establishing an exhaustive, literal picture of what transpired. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (only "the sting of the charge" reported by the newspaper need be "substantially true").

Finally, White asserts that because the third Post article made reference to the two-year-old IAD report, the Post knew and should have reported, beginning with the third article, that the initial EMIT test was only 5% reliable. Again, we reject this

argument for the reasons outlined in discussing its application to the FOP letters.

Having rejected White's claim that the Post is responsible for any omissions, we also find the articles incapable of bearing a defamatory meaning based on the text of the articles themselves. The Post merely reported true facts from which a reader might infer that White used drugs. But we find no evidence in the text of the articles to suggest that it would be reasonable for a reader to conclude that the Post intended the defamatory inference. Beyond unpleasant but true facts, the articles are devoid of any suggestive juxtapositions, turns of phrase, or incendiary headlines. *See, e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 60 (2d Cir.1980) (article with the headline "Buddy We Hardly Knew Ya" allowed readers to conclude that Mayor Cianci was accused of being a rapist and obstructor rather than the man of character he claimed he was).

This analysis applies equally to the false light claim against the Post. We have established that the picture created by the articles was substantially true. Therefore both the defamation and false light claims against the Post should be dismissed.

### 2. NBC

White's arguments with respect to NBC are essentially the same as those he raises against the Post, although he accords NBC limited praise for mentioning that the CompuChem lab regularly performed confirmatory testing for the Police Clinic. He contends that defamatory meaning arose from the use of his name and photograph, the dramatic announcement of White's appointment as head of the narcotics squad, and the omission of the nonconfirmation of the EMIT test on his first urine sample. He also contends that reporter Collins' statement, "White comes up clean," was intended to, and did, convey to the viewer that his first sample was "dirty."

■ The court admittedly is very troubled by the WRC–TV broadcast. We recognize that television news reporting is a different, more powerful genre than newsprint. With television, "[w]e must also take into account the impact of the visual effects as well as the text because 'the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript.'" *Southern Air Transport,* 877 F.2d at 1015 (citations omitted). Because a court must examine the entire context of a publication, *Tavoulareas,* 817 F.2d at 779, the court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning. Television touches more senses than does the print media, and the standards for finding defamation cannot be woodenly applied without taking into account the kind of medium by which the message was delivered.

■ All of the facts reported in the WRC–TV broadcast were materially true. For reasons outlined in the analysis for the Post, any omissions by NBC are immaterial. The display of White's picture at the beginning of the broadcast was not in any way suggestive; it merely attached a face to the name that would be used throughout the clip. We are left, then, with Pat Collins' dramatic announcement of White's subsequent elevation to head of the narcotics division and Collins' use of the words, "White comes up clean." We do not find that word choice to be sufficiently suggestive to enable a viewer to infer that Pat Collins intended or endorsed a defamatory inference that White used drugs. The effect of these words is no more suggestive than the Post's statement that "the second sample ... was reported free of drugs." Finally, we conclude that Pat Collins' dramatic intonation, standing alone or in combination with other factors, was not sufficiently distinctive to convey a clear implication to the viewers. We therefore conclude that the broadcast is not capable of conveying a defamatory meaning. As with the Post, we reject the false light claim against NBC because the picture created, though unpleasant, was substantially accurate. The Cox Committee itself acknowledged that the bare facts of this controversy

would create suspicion of illicit wrongdoing in the eyes of the public.

## F. *The Media Defendants—Privilege*

Our analysis thus far makes it clear that the defamation and false light actions cannot be sustained against the media defendants. The media defendants argued in the alternative that their communications were privileged. Normally the issue of privilege antecedes the question whether a communication is capable of defamatory meaning. We departed from this framework, however, because our privilege analysis does not apply equally to both media defendants. We hold in the alternative that White's action cannot proceed against the Post because the Post, unlike NBC, is protected by a common law privilege.

The Post and NBC both contend that their communications are protected by two theories of privilege: the common law privilege to publish fair and accurate reports of governmental proceedings and the First Amendment privilege of neutral reportage. The fair and accurate reporting privilege is a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statements as its own. *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 739 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). The privilege extends broadly to the report "of any official proceeding, or any action taken by any officer or agency of government." *Restatement (Second) of Torts* § 611, comment d (1977).

White contends that the common law privilege is not available to either media defendant because the reports were not "fair and accurate" and because they did not concern a governmental proceeding. We have already established that the reports were substantially accurate. For reasons already noted, we have no doubt that the Post's reports were fair summaries of the contents of the FOP letters. *See generally Dameron,* 779 F.2d at 739 (reports unfair and inaccurate where "garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made") (citations omitted).

We also have no doubt that the Post's reports concerned a governmental or official proceeding. In *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 88 (D.C. 1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981), the D.C. Court of Appeals outlined the breadth of the privilege:

[T]he privilege has been held applicable to reports of proceedings before any court, or agency of the court, ... reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies which are by law authorized to perform public duties, ... *as well as reports of any official proceeding or action taken by any officer or agency of government.*

424 A.2d at 88 (emphasis added). White argues that the news reports concerned not the Cox Committee proceedings but the allegations in the FOP letters. But, as the district court found, "it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding." Furthermore, it is of no moment whether the Committee's investigation was barred to the public. *See, e.g., Medico v. Time, Inc.,* 643 F.2d 134 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981) (applying the privilege, as described in the Second Restatement, to nonpublic FBI reports). Finally, beyond being fair and accurate, the Post articles clearly meet the second prong of the test for the privilege: proper attribution. The premise of the privilege is the interest of the public in obtaining information about what occurs in official proceedings and public meetings. Therefore, the privilege is only available to the media when their news reports are presented in such a manner that the average reader would be likely to understand the communication to be a report on—or summary of—an official document or proceeding. *Dameron,* 779 F.2d at 739.

The initial Post article, for example, began by stating that "[a] special police panel is investigating whether police officials ... tampered with drug testing procedures" at the Police and Fire Clinic. The first and all subsequent articles summarized the gist of the allegations set out in the FOP letters which the "special panel" was investigating, and consistently attributed the reported facts to those documents. Thus, the Post has met all of the requirements for invoking the fair report privilege.

By contrast, the NBC broadcast falls squarely within our ruling in *Dameron*, where a news report presented a story as a matter of historical fact without any indication that the statements were intended as a summary of an official document. 779 F.2d at 740. Not once did Pat Collins mention the Cox Committee investigation or the FOP letters, presenting instead historical facts as if they were the results of his own questioning of "police sources." Jim Vance's one-sentence reference to a "three-man task force assigned to investigate the matter" seems at most an afterthought which could scarcely be understood to attribute Collins' facts to the FOP letters.

Thus, the common law privilege of fair reportage on governmental proceedings is only available to the Post in this case. The media defendants argue that the fair reportage privilege is absolute. As the district court noted, this area is unsettled. This court has referred to the privilege as "absolute" in a passing reference that was not essential to our holding. *Liberty Lobby*, 838 F.2d at 1302 (D.C.Cir.1988). In contrast, the D.C. Court of Appeals referred to it as "qualified" in *Phillips*, 424 A.2d at 87, and a previous decision of the D.C. court squarely held that the privilege was qualified. *See Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C.1970). We are inclined to follow the rulings of the D.C. Court of Appeals in interpreting its own common law. Because White cannot defeat a qualified privilege, however, it is not necessary to resolve this issue. We have established that the Post's reports were substantially true, and therefore White cannot make any showing of malice by the

Post. The Post's communications, therefore, are privileged.

The media defendants also claim a right under the First Amendment to report accurately allegations of wrongdoing in a matter of public interest, even where the allegations are made outside of an official proceeding. The premise of this privilege, they claim, is that accusations of malfeasance by public officials are newsworthy, and the public will only learn of such charges if the press is immune from liability for dispassionate and disinterested reporting of such allegations. While the Second Circuit has recognized a constitutional privilege of "neutral reportage," *see Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), this circuit has not. Because we need not reach this question in order to resolve this case, we decline to do so. "[I]t is an elementary canon that American courts are not to 'pass upon a constitutional question ... if there is also present some other ground upon which the case may be disposed of.'" *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We note that even if the neutral reportage privilege were recognized by this court, NBC would not likely be able to invoke such privilege because its report does not attribute the facts to allegations made by the FOP.

## III. CONCLUSION

The intersection of so many strands of the law of defamation in this case demonstrates once again the delicate balance between the public's right to know and the individual's right to maintain his or her community standing. Because the media plays an instrumental role in disseminating information to the public, the balance necessarily favors the media as against communications by other parties; the judiciary, however, retains a responsibility to measure the media's performance against com-

plaints of defamation. The advent and ubiquity of the electronic media have made that balancing task even harder, but in this case Captain White's right to his reputation—and his right to be free from invasion by false light publicity—can only be pursued against the FOP.

*It is so ordered.*