MEMORANDUM AND ORDER

FRANK A. KAUFMAN, Senior District Judge.
(1) Reference is hereby made to defendants’ motion to dismiss and/or for summary judgment, filed January 19, 1994; plaintiffs’ opposition to said motion, filed March 7, 1994; and defendants’ reply thereto, filed March 29, 1994.[1]
(2) Plaintiffs Michael and his wife Sandra Crowley filed the within action to recover damages allegedly caused by a telecast entitled “Gunpowder River Rescue,” shown as part of the television program “Code 3.” Mi *701 chael Crowley is a member of the Maryland Army National Guard who, upon returning from weekend maneuvers on May 7, 1989, spotted two teenagers stranded in the middle of the fast-moving Gunpowder River clinging to a tree and jumped into the river to help them. The telecast at issue shows, with a combination of narration and contemporaneous footage, Mr. Crowley’s actions as well as the subsequent arrival of the Baltimore County Advanced Tactical Rescue Team and that squad’s rescue of Mr. Crowley and the two teenagers.
The narrator/host of the telecast describes Mr. Crowley, who is never named in the piece, as “a well-meaning National Guardsman who jumped in to help” and who “attempted a rescue—and now finds himself stranded.” Throughout this narration of events, Mr. Crowley is shown supporting one of the teenagers on his shoulders as they both cling to a small tree in the middle of the rising waters. Early in the report, a second national guardsman is shown entering the river while the narrator comments, “The second guardsman and his slack line are no match for the powerful current, which rushes past at nearly 20 miles per hour. Wisely, he hauls himself back, before he also becomes a victim.” Subsequently, the Rescue Team takes over the rescue operation and attempts two unsuccessful rescues, trying to get life preservers and an inflatable raft to the teenagers and Mr. Crowley. Shortly thereafter, “a state police helicopter, previously grounded by bad weather, becomes available.” As the rescue helicopter is shown arriving on the scene, a firefighter explains how he advised the helicopter to maneuver the rescue net “close enough to the victims.” Then, one of the teenagers panics, jumps into the river, and is rescued by a bag thrown from the shore. Following that rescue, the videotape shows Mr. Crowley placing the other teenager into the net. After that teenager is rescued, the narrator states that the helicopter moves in “to rescue the National Guardsman,” and the airlift of Mr. Crowley in the net is shown on the video. The report ends with the narrator and firefighter both advising the public to use life preservers when they go out on the water.
Mr. Crowley contends that the telecast falsely portrays him “as a victim rather than a hero, ... as someone who needed to be rescued, rather than as someone who safely effectuated a rescue, and [as someone] incapable of performing a rescue, ... in effect, a ‘bumbling idiot.’ ” Plaintiffs bring four counts in their complaint: (1) defamation, (2) false light invasion of privacy, (3) intentional infliction of emotional distress, and (4) loss of consortium.
(3) Under Fed.R.Civ.P. 56, this Court may grant summary judgment if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” “Whether a statement is actionable is a matter of law to be determined by the court.” Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993) (citation omitted).[2]
(4) As a preliminary matter, it is axiomatic that this Court must review the telecast itself because only by viewing the entire report can this Court take into account the combination of the audio, visual, and editing effects in that report. See White v. Fraternal Order of Police, 909 F.2d 512, 526 (D.C.Cir.1990) (quoting Southern Air Transport, Inc. v. American Broadcasting Cos., 877 F.2d 1010, 1015 (D.C.Cir.1989)) (“ ‘[T]he television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript.’ [Thus], a court must examine the entire context of a publication.”); Lasky v. American Broadcasting Cos., 631 F.Supp. 962, 970 (S.D.N.Y.1986) (“It is the entirety of the program, both audio and video, that must be considered in determining whether a television program is reasonably *702 susceptible of a defamatory meaning.”)- The videotape at issue in this case was filed by the defendant in an appropriate Fed.R.CivJP. 56 manner. In reviewing the record herein, this Court has not only read the transcript of the telecast but has also viewed it. This Court has also viewed a videotape provided by plaintiff which consists of a news telecast from Channel 9, the CBS affiliate in Washington, D.C. The Channel 9 report focuses almost exclusively on Mr. Crowley and his “heroic” efforts. Throughout that report, which alternates between showing live footage of the event and a personal interview with Mr. Crowley, Mr. Crowley refuses to take full credit for the rescue, instead re.peatedly calling the rescue a “team effort.”
(5) “Because this is a diversity action, the Court must apply Maryland’s choice of law provisions. ‘In tort actions, Maryland applies the doctrine of lex loci delicti which provides that the substantive law of the state where the wrong occurs governs.’ ” Southland Corp. v. Marley Co., 815 F.Supp. 881, 884 (D.Md.1993) (quoting Rockstroh v. A.H. Robins Co., Inc., 602 F.Supp. 1259, 1262 (D.Md.1985)). The parties appear to agree, without expressly addressing the issue, that Maryland law controls. However, it could possibly be argued that the “wrong” in this case occurred nationwide, when the Code 3 television show was published, i.e., telecast, and that therefore, federal law applies. However, although the Maryland courts have not addressed this precise question, the Restatement (Second) Conflict of Laws § 150 provides that:
(1) The rights and' liabilities that arise from defamatory matter in ... any one broadcast over radio or television ... are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties....
(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.[3]
Because Mr. and Mrs. Crowley are residents of Maryland, and because the Code 3 telecast was published in Maryland, the application of Maryland law to this case appears entirely reasonable.
(6) “To recover for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.” Rosenberg v. Helinski, 328 Md. 664, 675, 616 A.2d 866 (1992) (citations omitted), cert. denied, —- U.S. -, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). “A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person.” Batson, 325 Md. at 722-23, 602 A.2d 1191 (citing Bowie v. Evening News, 148 Md. 569, 574, 129 A. 797 (1925)). “Generally, a publication may convey a defamatory meaning if it ‘tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff’s associates.’ ” White, 909 F.2d at 518 (quoting Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 654 n. 10 (D.C.Cir.1966)). However, “[m]erely offensive or unpleasant statements are not defamatory.” Chapin, 993 F.2d at 1092.
(7) In this case, as a matter of law, the statements and pictures used in the Code 3 broadcast were not defamatory. “‘The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication to have been intended in the defamatory sense_’” White, 909 F.2d at 519 (quoting F. Harper, et al., The Law of *703 Torts § 5.4 (1986)). After viewing the entire videotape of the report “in the sense in which it would be understood by the average viewer,” Southern Air Transport, 877 F.2d at 1015, this Court concludes that a viewer of the Code 3 broadcast would not understand the Gunpowder River report as intending to defame Mr. Crowley. The visual aspect of the report shows Mr. Crowley holding on to a tree in the middle of fast-moving waters, bravely supporting a teenager on his shoulders the entire time. The tape also shows Mr. Crowley successfully placing one of the teenagers in the net dangling and swinging from the rescue helicopter.
As they must,, plaintiffs admit that the footage conveys the true facts of the rescue operation. Thus, plaintiffs attack only the narration. Plaintiffs state that the broadcast refers to Mr. Crowley as a “victim” who was “stranded” and “in need of rescue.” Contrary to plaintiffs’ assertions, the narration never explicitly refers to Mr. Crowley as a “victim.” Rather, that is the inference plaintiffs draw from the statements that Mr. Crowley found himself “stranded” and that the helicopter moved in “to rescue” him as well as the two teenagers. But even if that inference is assumed to have the meaning plaintiffs ascribe to it, it is still only part of a telecast which, when “viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn,” and thus, does not establish a libel. White, 909 F.2d at 520.[4]
There is no suggestion in the telecast that the show intended to portray Mr. Crowley as a victim or as an idiot or as anything other than a brave, “well-meaning national guardsman who jumped into help.” Nor is there any suggestion that Mr. Crowley was not of great help in the rescue attempt. Instead, it appears that the television show complained of by plaintiffs intended to focus on the Baltimore County Rescue Team and to demonstrate how that Team effectuated the helicopter rescue with the help of Mr. Crowley. The warnings at the end of the show, essentially admonishing the general public to wear life preservers, may make the teenagers look somewhat foolish, but certainly not plaintiff.[5] “[C]ourts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning.” White, 909 F.2d at 519. In sum, the presentation in Code 3 is, at most—and then even if at all—“merely offensive,”[6] and thus, is hardly capable of *704 carrying the defamatory meaning urged by plaintiffs.[7]
(8) In Maryland, a claim for false light invasion of privacy may not stand unless the claim also meets the standards for defamation. “[U]nder Maryland law, ‘[r]e-gardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply.’ ” AIDS Counseling & Testing Centers v. Group W Television, Inc., 903 F.2d 1000, 1004 n. 1 (4th Cir.1990) (quoting Phillips v. Washington Magazine, Inc., 58 Md.App. 30, 36 n. 1, 472 A.2d 98, cert. denied, 300 Md. 89, 475 A.2d 1201 (1984)). Accordingly, “in light of the coincidence of the elements of defamation and false-light invasion of privacy, we do not reach the question of the cognizibility of the false-light claim.” Id.
(9) Plaintiffs’ claim for intentional infliction of emotional distress must also fail. In Maryland, a plaintiff must establish four essential elements:
“(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe.”
Batson, 325 Md. at 734, 602 A.2d 1191. The conduct at issue in this case simply does not meet the test of “outrageousness,” i.e., it is not “ ‘so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.’ ” Id. (quoting Harris v. Jones, 281 Md. 560, 567, 380 A.2d 611 (1977)). In the light of this “high standard of culpability,” id., the court in Batson noted that it had upheld claims for intentional infliction of emotional distress only in three cases involving “truly egregious acts.” Id. 325 Md. at 735, 602 A.2d 1191.[8] The depiction of Mr. Crowley in the Code 3 television program does not, by the standards set under Maryland law, constitute intentional infliction of emotional distress.
(10) Because the three substantive tort counts are being dismissed, the damages claim for loss of consortium will also be dismissed.
(11) In the light of the foregoing, defendants’ motion for summary judgment will be GRANTED and judgment entered for defendants, in a separate ORDER of even date herewith.
(12) Copies of this Memorandum and Order are today being sent to counsel of record.
(13) It is so ORDERED.

ORDER

Judgment is hereby entered for defendants this 3rd day of May 1994.

. Because documents outside the pleadings are included in the record in this case, the defendants' motion is treated as one for summary judgment pursuant to Fed.R.Civ.P. 12(b) and 56.

. See also Batson v. Shiflett, 325 Md. 684, 723, 602 A.2d 1191 (1992) ("The threshold question of whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole....").

. Plaintiffs are residents of the State of Maryland. Defendant Fox Broadcasting Co. is a Delaware corporation with its principal place of business in California; defendant Barbour/Langley Films is a California corporation with its principal place of business in California; and defendant Fox Television station Channel 5 is a Delaware corporation with its principal place of business in Washington, D.C.

. In any event, it is dubious whether a characterization of Mr. Crowley as a "victim” is defamatory. Such a characterization, in the context of the report as a whole, suggests a subjective evaluation of the events shown on the tape in just about the same vein as is plaintiffs' contention that Mr. Crowley is a "hero.” "Though opinion per se is not immune from a suit for libel, a statement is not actionable unless it asserts a provably false fact or factual connotation.” Chapin, 993 F.2d at 1093 (citations omitted). Thus, even if the telecast had stated explicitly that Mr. Crowley was a "bumbling idiot,” such statement might not be actionable as defamation.

. There is no suggestion in the telecast that Mr. Crowley should have gone to get a life preserver before he jumped into the water to help the two teenagers. To have done so might well have caused Mr. Crowley to arrive in the water too late to have been of any aid to the teenagers. Thus, while he was himself rescued after the teenagers were, and in that sense may have been a “victim," he was portrayed correctly as a victim of his own heroic action and not as someone who acted foolishly or in a manner subject to any sensible criticism. Nothing to the contrary has been offered by plaintiffs in opposition to defendants' summary judgment motion, although plaintiffs are arguably contending that, in their opinion, Mr. Crowley and the other guardsmen could have recovered the teenagers without the help of the Rescue Team. Whether or not the guardsmen could have so succeeded without the rescue team is hardly a relevant fact herein. In both telecasts, the Code 3 report, as well as the Channel 9 report provided by plaintiffs, Mr. Crowley appears to the viewer as a heroic actor in a time of crisis. The Code 3 report, however, simply does not focus on plaintiff to the same degree as does the Channel 9 report.

.This Court notes that there is no allegation by plaintiffs whatsoever that the alleged defamatory statements injured Mr. Crowley in his chosen profession. Cf. Moldea v. New York Times Co., 15 F.3d 1137, 1140, 1143 (D.C.Cir.1994). Rather, plaintiffs attach exhibits of numerous written commendations from Mr. Crowley's superiors, as well as exhibits of letters from Senator Mikulski and Governor Schaefer congratulating Mr. Crowley for receiving the Maryland Medal of Valor.

. Plaintiffs attach several affidavits to their pleadings from friends and associates, each of which claim in essence that the Code 3 report made Mr. Crowley look foolish, in direct contradiction to Mr. Crowley's actions at the scene. However, a court generally should not "consider extrinsic evidence beyond what is stated in the actual communication in evaluating potential defamatory meaning.’’ White, 909 F.2d at 520.

. “See Figueiredo-Torres v. Nickel, 321 Md. 642, 584 A.2d 69 (1991) (psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor); B.N. v. K.K., 312 Md. 135, 538 A.2d 1175 (1988) (physician did not tell nurse with whom he had sexual intercourse that he had herpes); Young v. Hartford Accident & Indemnity, 303 Md. 182, 492 A.2d 1270 (1985) (worker’s compensation insurer's 'sole purpose’ in insisting that claimant submit to psychiatric examination was to harass her and force her to abandon her claim or to commit suicide).”
Id. 325 Md. at 735, 602 A.2d 1191.