**M. Dennis SCULIMBRENE, Plaintiff,**

v.

**Janet RENO, et al., Defendants.**

**No. CIV.A.99–2010(CKK).**

United States District Court, District of Columbia.

Feb. 16, 2001.

Paul J. Orfanedes, Klayman & Associates, PC, Larry E. Klayman, Judicial Watch, Inc., Washington, DC, for Plaintiff.

Anne L. Weissman, John Russell Tyler, U.S. Dept. of Justice, Timothy B. Mills, Patton Boggs, L.L.P., Washington, DC, Thomas P. Ryan, McCarthy, Wilson & Ethridge, Rockville, MD, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case comes before the Court on Defendant Lanny J. Davis' motion to dismiss and/or for summary judgment. The facts and circumstances of this case arise out of Plaintiff Dennis Sculimbrene's employment with the Federal Bureau of Investigation ("FBI") and his work at the FBI's White House Liaison Office. Plaintiff alleges that Defendant FBI violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and that Defendant Executive Office

of the President ("EOP") violated the Privacy Act, 5 U.S.C. § 552a. Plaintiff also alleges that Defendants Jack Quinn, Howard Shapiro, Lanny Davis, and unnamed Defendants John and Jane Does Nos. 1–5 violated the Ku Klux Klan Act, 42 U.S.C. §§ 1985(1) and 1985(2), and in addition, that these same Defendants, with the exclusion of Mr. Davis, violated Plaintiff's rights under the First and Fifth Amendments of the United States Constitution. In this Memorandum Opinion, the Court addresses only Defendant Davis' motion.

## I. BACKGROUND

Plaintiff Sculimbrene is a former employee of the FBI who, during his employment, was on detail to the White House Liaison Office at the time the Clinton Administration assumed control of the White House in early 1993. Agent Sculimbrene's detail duties required him to conduct background interviews of White House executives and staff, as well as other detailees, volunteers, and contractors requiring access to the White House. *See* Complaint ¶ 13. To provide some context to the following discussion, it is helpful to recite some of the general allegations set forth in Plaintiff's Complaint:

Plaintiff alleges that, in early March 1993, three White House officials associated with the Clinton Administration "tried to question Plaintiff about the backgrounds and political views of the staff of the White House Travel Office." *Id.* ¶ 17. After declining to reveal any information, Plaintiff notified his supervisor about the questioning and expressed his belief that the White House was "using" the FBI to provide an excuse to terminate the Travel Office employees. *See id.* ¶¶ 18, 19.

Around the same time, Plaintiff conducted several interviews in conjunction with the background investigation of David Craig Livingstone, who was then a candi-

date for appointment as Director of the White House Office of Personnel Security. *See id.* ¶ 20. As part of routine procedure in relation to that investigation, Plaintiff interviewed White House Counsel Bernard Nussbaum. *See id.* ¶ 21. Nussbaum allegedly related to Plaintiff that "he did not know Livingstone well, but that he had been highly recommended by Hillary Clinton, who apparently knew Livingstone's mother." *Id.* ¶ 22. Plaintiff then prepared a memorandum, formally called an "insert," which reflected the information obtained from Nussbaum regarding the alleged relationship between Hillary Clinton and Livingstone's mother. *See id.* ¶ 23. The insert was allegedly sent to the FBI's Washington Field Office, where it was to have been placed in Livingstone's permanent FBI file. *See id.* ¶ 24.

In May 1993, the White House publicly announced that the White House Travel Office staff was being terminated for alleged financial improprieties and that the FBI would soon commence a criminal investigation. *See id.* ¶ 27. The firing of the Travel Office was suspected, by some, to have been politically motivated. *See id.* ¶ 28. As a result, the facts and circumstances surrounding the firing evolved into a political scandal known as "Travelgate." *See id.* ¶ 29. Travelgate eventually became the subject of congressional hearings and was the subject of investigation by Independent Counsel Kenneth Starr. *See id.* ¶ 30.

Shortly after the Travel Office firings were announced in May of 1993, Plaintiff claims to have witnessed numerous "unknown persons going through files and throwing items away, which appeared to be official documents," in the White House Travel Office. *See id.* ¶ 31. Around the same time, Plaintiff claims to have advised his immediate supervisor, Supervisory Special Agent ("SSA") Thomas Reneghan,

and SSA David Bowie, "the supervisor of the criminal case that was eventually brought against former White House Travel Office Director Billy Dale, that he was concerned about chain of custody issues." *Id.* at ¶ 32. Plaintiff further recommended that the FBI interview him, and provided a memorandum to his immediate supervisor setting forth his observations and concerns. *See id.* Plaintiff was interviewed on the subject in 1995. *See id.*

In early November 1995, Agent Sculimbrene testified as a defense witness at the criminal trial of Billy Dale, the former head of the White House Travel Office. *See id.* ¶ 60. According to Agent Sculimbrene, his testimony "received substantial press coverage, much of which was unfavorable towards the White House and the FBI." *Id.* ¶ 61. In early 1996, Plaintiff met with two representatives from the General Counsel's Office who had allegedly been sent by Howard Shapiro, General Counsel to the FBI, to meet with Agent Sculimbrene and his supervisor. *See id.* ¶ 72. During that meeting, Plaintiff claims to have confirmed that three White House officials had tried to obtain information from him about the White House Travel Office staff. *See id.* ¶ 73. Plaintiff also allegedly confirmed the accuracy of certain information which had been revealed in a manuscript written by Gary Aldrich, a former FBI Agent who had worked at the White House with Agent Sculimbrene. *See id.* ¶ 74. That manuscript, later published as a book entitled *Unlimited Access*, makes numerous references to Plaintiff and attributes several direct quotes to him. *See id.* ¶ 75.

On February 28, 1996, Plaintiff received notice that he was being investigated for unprofessional conduct. *See id.* ¶ 81. During an interview which was taken in conjunction with the investigation, Agent Sculimbrene learned of an anonymous let-

ter which allegedly included some of the charges of unprofessional conduct. *See id.* ¶¶ 86–88. Plaintiff claims to have not seen the letter at that time. The investigation into Plaintiff's alleged unprofessional conduct was eventually closed in the spring of 1996. *See id.* ¶ 99.

On May 24, 1996, Agent Sculimbrene filed an administrative complaint against the FBI alleging that the FBI had unlawfully removed certain reasonable employment accommodations which had been granted to Plaintiff following a head injury he suffered in early 1994 outside of work. *See id.* ¶ 100. That complaint was ultimately denied, on April 24, 1999. *See id.* ¶ 142.

In early June 1996, reports of a new political scandal—"Filegate"—appeared, alleging that Livingstone and a detailee assigned to the White House Office of Personnel Security obtained FBI background investigation summaries on numerous former Reagan and Bush Administration employees. *See id.* ¶ 103. Like Travelgate, Filegate became the subject of Congressional hearings and an investigation by Independent Counsel Starr. *See id.* ¶¶ 104, 105. In June of 1996, Plaintiff gave an unsworn interview to the Senate Judiciary Committee concerning Filegate wherein Plaintiff relayed his opinion regarding the "chaotic management" of the White House Personnel Security Office and the alleged connection between Livingstone and Hillary Clinton. *Id.* ¶¶ 106–108. Plaintiff also told the Committee that "he was concerned he was being retaliated against for testifying on behalf of Mr. Dale at Mr. Dale's criminal trial." *Id.* ¶ 111. The following month. Plaintiff gave a sworn deposition to the House of Representatives, wherein he linked Livingstone's hiring to the First Lady. *See id.* ¶ 115. Plaintiff further alleges that "on or about the same day" as his deposition be-

fore the House, FBI General Counsel Howard Shapiro alerted the White House that the FBI had found the Nussbaum "insert." *See id.* ¶ 116. The day following his testimony, two FBI agents were dispatched to Plaintiff's home to interview him about the "insert" related to his three-year-old interview with Nussbaum regarding Livingstone. *See id.* ¶¶ 117, 118.

Plaintiff alleges that on July 25, 1996, White House Counsel Jack Quinn sent a letter to FBI director Louis Freeh regarding Plaintiff's insert about Livingstone. *See id.* ¶ 126. Sculimbrene further asserts that "FBI General Counsel Howard Shapiro, other, unknown White House officials and agents, and other unknown FBI officials participated" in the drafting of that letter and that Shapiro "reviewed different drafts" of the letter. *Id.* ¶¶ 127, 128. On July 26, 1996, Lanny J. Davis, a media commentator, appeared on CNN's *Cross-Fire* and attacked Plaintiff's credibility. *Id.* ¶ 130. A few days later, Mr. Davis appeared on CNBC's *Rivera Live* and made similar statements. *Id.* ¶ 131. Plaintiff alleges that Mr. Davis "communicated with [Jack] Quinn, [Howard] Shapiro and other currently unknown White House officials and agents to discuss what he would say about Plaintiff" on the aforementioned programs. *Id.* ¶ 135.

Plaintiff contends that, on March 5, 1998, he "was forced to take an early retirement from the FBI as a result of the . . . false accusations and disparagement to which he had been subjected, and the other, unwarranted retaliation and harassment alleged herein." *Id.* ¶ 139. Relevant to the instant motion. Plaintiff claims that Mr. Davis conspired with others, in violation of 42 U.S.C. § 1985(1), to "injure Plaintiff in his person and property on account of the lawful discharge of his duties," and, in violation of 42 U.S.C.

§ 1985(2), to similarly injure Plaintiff "on account of Plaintiff's having provided testimony in a court of law of the United States." *Id.* ¶¶ 155, 156.

## II. LEGAL STANDARD

This Court will not grant a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, at this nascent stage in the litigation, the Court assumes the veracity of all factual allegations forwarded by the Complaint. *See Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). Moreover, "[t]he complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979). Nonetheless, the Court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C.Cir.1997).

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir. 1994). Although a court should draw all reasonable inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute,

by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party's pleadings must evince the existence of a genuine issue of material fact. *See id.* at 247–48, 106 S.Ct. 2505. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party. *See id.; Laningham v. United States Navy*, 813 F.2d 1236, 1242–43 (D.C.Cir.1987). Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial; not simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.* at 587.

## III. DISCUSSION

### A. Motion to Dismiss

 Defendant Davis moves to dismiss, or in the alternative, for summary judgment with regard to Plaintiff's Section 1985 claims against him, which are contained in Count III.[1] Specifically, Defen-

---

1. Although neither party raises the matter in their briefs, the Court notes, without addressing the merits of the issue, that there is a split of authority as to whether a claim under Section 1985(2), which proscribes the intimi-

dation of, or retaliation against, witnesses testifying in a federal court action, can be brought by an individual who was not a party to that action. *See, e.g., David v. United States*, 820 F.2d 1038, 1040 (9th Cir.1987)

dant Davis argues that he is entitled to dismissal on the grounds that Plaintiff has not sufficiently plead all of the elements of a conspiracy.[2] In the alternative, Defendant Davis argues that he is entitled to summary judgment on the grounds that his actions are protected by the First Amendment. Agent Sculimbrene opposes this motion on the grounds that his Complaint has sufficiently pled the elements of a conspiracy, and that summary judgment is not appropriate at this time.[3]

Mr. Davis is a self-described "media commentator," who made various statements regarding Agent Sculimbrene on two television programs, on July 26, 1996, and August 2, 1996. *See* Davis Reply at

12; Complaint at ¶¶ 130, 131. Plaintiff alleges that prior to these two appearances. "[Mr.] Davis had appeared frequently on television programs as a spokesman and surrogate for The White House." Complaint ¶ 25. Plaintiff further alleges that prior to appearing on these television programs, Mr. Davis communicated with Defendants Quinn and Shapiro (and other unknown White House officials) regarding what he would say about Agent Sculimbrene on these programs and that Mr. Davis received background information concerning Agent Sculimbrene from Defendant Quinn and others. Complaint ¶¶ 135, 136. Based on these allegations, Plaintiff alleges that Defendant Davis conspired with Defendants Quinn and Shapi-

("Allegations of witness intimidation under § 1985(2) will not suffice for a cause of action unless it can be shown the litigant was hampered in being able to present an effective case."); *Brever v. Rockwell Int'l. Corp.,* 40 F.3d 1119, 1125 n. 7 (10th Cir.1994) (holding that a witness testifying before a federal grand jury, has standing to sue under Section 1985(2)).

2. After briefing had concluded on Defendant Davis' Motion to Dismiss or, in the alternative, for Summary Judgment, Plaintiff Sculimbrene filed a motion seeking leave to supplement his opposition to Defendant Davis' motion. In his motion, Plaintiff Sculimbrene argues that he should be permitted to supplement his opposition with newly acquired information relevant to Defendant Davis' motion. The supplemental material is offered in support of the conspiracy element in Plaintiff Sculimbrene's claims against Defendant Davis. Seeing little reason to deny Plaintiff's motion, the Court shall grant the same. Likewise, Plaintiff's motion to strike Defendant Davis' Opposition to this supplemental material shall be denied.

Having reviewed Plaintiff's supplementary materials, the Court notes that because the Court's resolution of Defendant Davis' motion does not turn on an analysis of the conspiracy element in Plaintiff's claim against Defendant Davis, the supplementary materials are sharply limited in their usefulness.

3. Defendant Davis also argues in his Memorandum in support of his motion, though not in his Reply, that he is entitled to dismissal on the grounds that Virginia's statute of limitations applies to Plaintiff's claims, and that under Virginia law, Plaintiff's claims are barred as untimely. Defendant Davis' assertion follows from his contention that the statute of limitations in this case should be ascertained pursuant to a choice of law analysis. However, choice of law analysis generally applies to diversity actions, and this is not a diversity action. For actions arising under federal statute, District of Columbia Circuit law provides that "[w]here a federal cause of action does not contain its own statute of limitations, the analogous local limitations period is grafted on as a general rule." *Fitzgerald v. Seamans,* 553 F.2d 220, 223 n. 3 (D.C.Cir.1977). D.C.Code Section 12–301(8) provides for a three year statute of limitations for actions where limitation is not otherwise specially prescribed. *See* D.C.Code § 21–301(8). The D.C. Circuit has previously applied the D.C.Code's three-year default provision to claims brought under 42 U.S.C.1985. *See Fitzgerald,* 553 F.2d at 223. Plaintiffs' claims appear to be timely under a three-year statute of limitations. Accordingly, Defendant Davis' statute of limitations argument is without merit.

ro,[4] and others, in violation of 42 U.S.C. § 1985, to injure Plaintiff, by harming his "good name and reputation," on account of the discharge of his duties as an FBI agent and his testimony at the Dale trial. *See* Pl. Opp. to Davis Mot. at 14–15.

The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983). Plaintiff must allege a "meeting of the minds" as to some improper purpose, as it is an essential element of a conspiracy claim under Section 1985. *See Graves v. United States*, 961 F.Supp. 314, 320 (D.D.C.1997). A plaintiff must also allege a causal connection between the overt act(s) taken in furtherance of the conspiracy and the alleged injury. *See id.* at 321.

Plaintiff's Complaint, as originally filed, does not specifically allege the existence of an "agreement." Instead, the Complaint describes circumstances which involve communication between the individual defendants and alleges that the result of these communications was to discredit and defame Plaintiff. In his proposed amended complaint, Plaintiff attempts to correct this omission by including a specific allegation that the individual defendants "agreed, tacitly or to [sic] explicitly, to participate in a common scheme and unlawful conspiracy to injure Plaintiff." *See* Proposed Amended Compl. ¶ 140, Pl. Opp. to Davis Mot. Ex 4.

In addition, Plaintiff's original Complaint alleges that Mr. Davis knowingly accused Plaintiff of "committing a criminal offense." Complaint at ¶ 137. Plaintiff's original Complaint does not allege that Mr. Davis' television appearances were acts in furtherance of an agreement among the individual defendants. *See id.;* Davis Mot. at 15. However, this failure also appears to be cured by Plaintiff's proposed amended complaint. *See* Proposed Amended Compl. ¶ 142. Pl. Opp. to Davis Mot. Ex 4. In his original Complaint, Plaintiff alleges, however loosely, that as a result of the Mr. Davis' statements he suffered "loss of income, loss of reputation, and emotional distress." Complaint at ¶ 157. Although Plaintiff successfully bolsters these allegations in his proposed amended complaint, he still fails to provide any factual specifics which evidence these alleged injuries. *See id.* Instead, Plaintiff's proposed amended complaint alleges only that Mr. Davis, through his alleged conspiracy with the other individual defendants, caused these harms.[5] *See* Proposed Amended Compl. ¶ 149, Pl. Opp. to Davis Mot. Ex 4.

---

4. As discussed in *Sculimbrene v. Reno*, 158 F.Supp.2d 1 (D.D.C.2001) (Memorandum Opinion and Order granting Jack Quinn and Howard Shapiro's Motion to Dismiss). Plaintiff's conspiracy claims against Defendants Quinn and Shapiro are precluded by the Civil Service Reform Act ("CSRA"). However, unlike Defendants Quinn and Shapiro, at the relevant time, Defendant Davis was not an employee of the federal government, and thus, Plaintiff's grievances against Defendant Davis are not precluded by the CSRA.

5. Indeed, careful examination of Plaintiff's Complaint reveals further causation difficulties in that Plaintiff told the Senate Judiciary Committee that he began to feel some of his alleged harms, i.e., retaliation for his testimony at Billy Dale's trial, over a month prior to Mr. Davis' allegedly injurious acts, yet the Complaint does not allege that Mr. Davis joined an ongoing conspiracy. *See* Complaint ¶¶ 111. Accordingly, Plaintiff's Complaint, as written, indicates that at least some of his alleged harms cannot be attributed to Mr. Davis, Plaintiff's proposed amended com-

Most significantly, Plaintiff's Complaint fails to allege a nexus between Mr. Davis' televised comments and Plaintiff's exercise of his duties for the FBI and his testimony at the criminal trial of Billy Dale. Nowhere in Plaintiff's Complaint does he allege that Mr. Davis' comments were intended as a retaliation for Plaintiff's testimony at the Dale trial in violation of Section 1985(2). *See generally* Complaint. Plaintiff's proposed amended complaint cures this defect. *See* Proposed Amended Compl. ¶ 140, Pl. Opp. to Davis Mot. Ex 4 ("Quinn, Shapiro, Davis, and other currently unknown White House officials and agents agreed, tacitly or to [sic] explicitly, to participate in a common scheme or unlawful conspiracy to injure Plaintiff by destroying his good name, credibility, and reputation on account of his having discharged his duties as a Special Agent for the FBI, both in preparing the insert and appearing before Congress, and for having testified truthfully at Billy Dale's criminal trial.").

■ Under Rule 15(a), "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served .... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party." FED. R. CIV. P. 15(a). In this case, Defendant Davis has not yet filed a responsive pleading, but instead, has filed a motion to dismiss. Generally, a motion to dismiss does not

qualify as a responsive pleading for purposes of Rule 15. *See Bowden v. United States*, 176 F.3d 552, 555 (D.C.Cir.1999) (*citing Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993)). Accordingly, pursuant to Rule 15(a)'s provision for amendment "as matter of course" if no "responsive pleading [has been] served," Plaintiff may amend his Complaint as a matter of course. FED. R. CIV. P. 15(a).

■ However, Plaintiff has not actually filed his amended complaint, nor moved for leave to do so. Rather, Plaintiff attached a proposed amended complaint as an exhibit to his Opposition to Defendant Davis' motion. *See* Proposed Amended Compl., Pl. Opp. to Davis Mot. Ex 4. Recognizing that most of the pleading defects related to Plaintiff's Section 1985 claim against Mr. Davis can be cured by amendment, the interests of justice do not favor granting Mr. Davis' motion to dismiss for failure to state a claim. However, these defects will persist until an amended complaint is actually *filed* with the Court.[6]

### B. Motion for Summary Judgment

■ Defendant Davis' motion alternatively seeks summary judgment, based on his First Amendment defense. Defendant Davis argues that his expression of his opinions on public television regarding matters of "national political significance and the conduct of public officials" consti-

---

plaint does not cure this internal contradiction in Plaintiff's theory of liability.

**6.** Defendant Davis cites *Reiss v. Richardson*, 455 F.2d 1287, 1289 n. 2 (D.C.Cir.1971) for the proposition that an amended complaint attached to a party's opposition, but not filed with the Court, need not be considered by the Court when ruling on a motion to dismiss. While correct, the *Reiss* court proceeded, as this Court has, to examine the proposed amended complaint to discover whether the changes cure the defects relied upon by the moving party. Upon that examination, the

*Reiss* court determined that the district court's treatment of the proposed amended complaint was irrelevant, since the amendments had failed to cure the defects. In contrast to the situation before the *Reiss* court, the amendments to the Complaint appear to cure the defects in Plaintiff's original Complaint. Accordingly, there appears to be no error in considering Plaintiff's proposed amended complaint in reaching the conclusion that dismissal is not warranted at this stage.

tutes protected exercise of his First Amendment rights. Davis Mot. at 19. The seminal case relevant to this defense is *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *New York Times* establishes the parameters of the First Amendment right to free speech as it relates to an action for damages allegedly caused by that speech. *See id.* at 269, 84 S.Ct. 710. Relying upon the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," the *New York Times* Court interpreted the Constitution to require some heightened level of protection for speakers faced with lawsuits arising out of speech related to public officials. *See id.* at 270, 84 S.Ct. 710. These safeguards, stated the Court, are necessary to protect against "the pall of fear and timidity imposed upon those who would give voice to public criticism" and to prevent a rule which "dampens the vigor and limits the variety of public debate." *Id.* at 278–79, 84 S.Ct. 710. Based on this logic, the Court concluded that "[t]he constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710.

Although the instant action is not a traditional defamation action, the fact that this suit arises under 42 U.S.C. § 1985 does not prevent the same First Amendment safeguards from extending to Mr. Davis' speech. *Cf. id.* at 274–76, 84 S.Ct. 710 (discussing the Sedition Act of 1798 and adopting the "broad consensus that the Act, because of the restraint it imposed upon the criticism of government and public officials, was inconsistent with the First

Amendment."). Like the libel statute at issue in *New York Times v. Sullivan* and the Sedition Act of 1798, Section 1985 of Title 42 carries the *potential* to infringe upon a speaker's First Amendment right if certain safeguards are not imposed. *See id.* at 273–80, 84 S.Ct. 710. Rather than bring his claim as a tort action for defamation, Plaintiff alleges that Defendant Davis engaged in a conspiracy to harm Plaintiff "on account of his lawful discharge of the duties of his office" and "on account of his having provided testimony" in the criminal trial of Billy Dale in violation of 42 U.S.C. § 1985(1) and (2). Complaint ¶¶ 155, 156. Plaintiff's theory posits that Defendant Davis conspired with others to "smear his good name and reputation." *See* Pl. Opp. to Davis. Mot. at 18. Thus, in effect, Plaintiff's cause of action rests upon the belief that Defendant Davis conspired with others to defame him. Accordingly, the constitutional considerations and protections afforded to defendants in a defamation action seem equally applicable to the Section 1985 claims presented in this case.

■■■ Mr. Davis first defends himself against Plaintiff's allegations of defamation in violation of Section 1985 by arguing that he is immune from defamation-based liability for his televised comments on the grounds that they are statements of opinion. *See* Davis Mem. at 27. This assertion alone is not sufficient to protect Mr. Davis from a finding of liability, as the Supreme Court has categorically declined to offer "First Amendment-based protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In fact, the *Milkovich* Court used an example nearly identical to the case before this Court to illustrate its holding:

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge

of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement. "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' "

*Id.* at 18–19, 110 S.Ct. 2695 (quoting *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir.1980)). Given this language, it would be impossible for this Court to give credence to Mr. Davis' contention that

his speech is protected solely on the grounds that it constitutes an opinion.[7] To create a "wholesale defamation exemption for anything that might be labeled 'opinion' . . . ignore[s] the fact that expressions of 'opinion' may very often imply an assertion of objective fact" *Id.* at 18, 110 S.Ct. 2695. The statements in this case carry just such an implication. Accordingly, Mr. Davis' opinion-based defense must be rejected.

 Proceeding with a defamation-based First Amendment analysis, the Court must determine, as a threshold matter, whether Mr. Davis is entitled to the heightened protections discussed in *New York Times Co. v. Sullivan.*[8] A defendant is entitled to additional protections for potentially defamatory comments if the comments were made about a "public official" or a "public figure." *See New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710 (discussing "public officials"); *Gertz v. Robert Welch. Inc.*, 418 U.S. 323, 335, 94 S.Ct.

7. The *Milkovich* discussion is also instructive with regard to Mr. Davis' contention that he did not accuse Agent Sculimbrene of committing a crime, and thus the statements lack "the defamatory meaning which Plaintiff attributes to them." There is little cause to dwell on this contention because Mr. Davis' statements, if not otherwise protected by the First Amendment, appear to be defamatory in nature, regardless of whether they rise to the level of criminal accusation. The *Milkovich* Court adopted the view that "[u]nder the law of defamation, an expression of opinion could be defamatory if the expression was sufficiently derogatory of another as to cause harm to his reputation, so as to lower him in the esteem of the community." 497 U.S. at 13, 110 S.Ct. 2695 (quoting Restatement (Second) of Torts § 566 (1977), Comment a). The D.C. Circuit has made similar statements, specifically with regard to one's reputation in business, stating that a defamatory comment might be any statement "which might tend[ ] to injure [plaintiff] in his trade, profession or community standing, or lower him in the estimation of the community." *Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C.Cir.1987) (quot-

ing *Afro–American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966)) (internal quotations omitted). Mr. Davis' statements about Agent Sculimbrene's credibility fit squarely within the D.C. Circuit's definition of defamatory statements, since an attack on an individual's veracity is likely to injure his reputation in his profession or lower his community standing.

8. Mr. Davis also argues that his public statements are specifically protected by the right to petition for redress of grievances. *See* Davis Mem at 36. This argument is essentially analogous to his general First Amendment-based argument that his comments are privileged because they constitute "public criticism of governmental policy and those responsible for government operations [which] is at the very core of the constitutionally protected free speech area." *See* Davis Mem. at 19 (quoting *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir.1977)). Accordingly, the Court's consideration of this theory of immunity is subsumed into the discussion of protections afforded by *New York Times v. Sullivan* and its progeny.

2997, 41 L.Ed.2d 789 (1974) (noting the extension of "the constitutional privilege to defamatory criticism of 'public figures' ... announced in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and its companion. *Associated Press v. Walker,*."). Apparently combining its discussion of "public figures" with "public officials," the Supreme Court has reiterated that the *New York Times* rule applies to either kind of "public person:"

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

*Gertz,* 418 U.S. at 342, 94 S.Ct. 2997. Plaintiff could potentially be considered a public person under either the public official or public figure theory. To be a "public official," the Court would have to conclude that, as an FBI agent who worked at the White House, Plaintiff was "an individual who decides to seek governmental office." *See id.* at 344, 94 S.Ct. 2997. To be a traditional "public figure," the Court would most likely have to conclude that Plaintiff Sculimbrene "thrust [himself] to the forefront of a particular public controversy to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. 2997. A preliminary review of the facts reveals that such a finding is unlikely. However, there is also the potential that the facts in this case will support a finding that Plaintiff is one of the few involuntary public figures who becomes a public figure "through no purposeful action of his own." *Id.* at 345, 94 S.Ct. 2997.

Addressing the "public official" theory first, the Court finds guidance in *White v. Fraternal Order of Police,* 909 F.2d 512 (D.C.Cir.1990). In *White,* the Court of Appeals for the D.C. Circuit briefly examined the parameters of "public official" status. The *White* case involved letters and newspaper articles which described some "irregularities" in the drug testing of a police lieutenant, who was being considered for promotion to Captain in the Washington, D.C. Metropolitan Police Department (MPD). *White,* 909 F.2d at 515. The defamatory implication of the letters was that the system had been corrupted, the tests falsified, and that officials might have been bribed.

Although the plaintiff in *White* "concede[d] that under relevant case law, he is a public official," the Court of Appeals collaborated upon this concession, and justified its acceptance of it. *See id.* at 517. Noting that "the public's interest 'extends to anything which might touch on an official's fitness for office,'" the court deemed it "axiomatic that personal drug use is relevant to fitness for public office, especially for officials charged with enforcing the law." *Id.* (quoting *Gertz,* 418 U.S. at 344–45, 94 S.Ct. 2997) (internal quotations omitted). The court summarized the basis for its conclusion that a police lieutenant in line to be captain is a "public official" by lamenting the "specter of officials who swear to uphold and enforce the law as they break and compromise the law" as being a "plague[ ] on our democracy." *Id.*

While there are similarities between the plaintiff in *White* and Agent Sculimbrene, namely that both were sworn to uphold and enforce the law, there are sufficient differences to prevent a certain and quick conclusion that Plaintiff should be designated as a public official. For example. Agent Sculimbrene's duties were largely administrative, consisting of interviewing

and obtaining background information on potential White House employees. *See* Sculimbrene Decl. ¶¶ 6, 7, 10. Notably, Agent Sculimbrene's duties at the White House did not include "any action that would have directly affected any individual's personal freedom," "the use of force," nor the making of arrests. *See id.* ¶ 10; Nonetheless, Mr. Davis appropriately points out that Agent Sculimbrene was charged with a very significant "gatekeeping" role in investigating the suitability of appointees who work in close proximity to the President, have access to classified information, and make significant policy decisions which impact upon the citizens of the United States. *See* Davis Reply at 14. Given these considerations, it is not clear that Agent Sculimbrene, though technically a law enforcement officer, can be viewed as substantially analogous to the plaintiff in *White,* and thus, treated as a public official.

Mr. Davis directs the Court's attention to *Buendorf v. National Public Radio, Inc.,* 822 F.Supp. 6 (D.D.C.1993), as another analogous case. *Buendorf* essentially ignores the admittedly limited analysis available in *White,* and relies instead on core Supreme Court defamation cases, such as *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), and *New York Times v. Sullivan* to conclude that the plaintiff, the Special–Agent–in–Charge of the Secret Service detail which protected former President Gerald Ford, was a public official. *See* 822 F.Supp. at 10–11. The *Buendorf* court also relied on the opinion in *Meiners v. Moriarity,* 563 F.2d 343 (7th Cir.1977). The *Meiners* court held that, although the public has an "important and special" interest in the qualifications of "federal agents . . . whose decisions personally affect individual freedoms" a case by case analysis of the facts will be necessary to prevent interpretation of the term "public official" as "synony-

mous" with the term "government employee." 563 F.2d at 352. The *Meiners* rationale presents an interesting quandary in, this case because Agent Sculimbrene, as an FBI special agent, is likely more analogous to a "public official," as defined in that case, than to a mere "government employee." Preliminarily, the Court notes that Agent Sculimbrene lacks one of the specific public official characteristics highlighted and relied upon by the *Meiners* court, namely, that Agent Sculimbrene, unlike the plaintiff in *Meiners,* was not called upon to exercise authority that "personally affect[s] individual freedoms" by carrying a firearm or making arrests. *Id.* Nonetheless, in his role as the senior FBI agent detailed to the White House, Agent Sculimbrene enjoyed access to "highly classified information" and maintained significant gatekeeping authority over access to the White House. Complaint ¶ 16.

Plaintiff Sculimbrene argues that *Buendorf* is not instructive in this case because the plaintiff in *Buendorf* is readily distinguishable. Plaintiff argues that his duties at the White House were not as significant, and that he was merely a Special Agent, and not "Special–Agent–in–Charge," like the plaintiff in *Buendorf,* who had "significant responsibility and control over a very important government affair." Pl. Opp. to Davis Mot. at 21–22. Mr. Davis counters that Plaintiff cannot so conveniently minimize his duties at the White House. By his own account, Plaintiff identified himself as the "senior FBI special agent detailed to the White House." Complaint ¶ 11. Plaintiff testified before the House Government Oversight Committee that as senior FBI agent, he determined which FBI agents would work at the White House. *See* Davis Reply, Ex. 1 at 6. In addition, Plaintiff's Complaint indicates that "he was the only FBI agent at the

White House with a special 'Secret Compartmentalized Information' security clearance, which allowed him to have access to highly classified information." Complaint ¶ 11. Thus, because it appears that Plaintiff's "public" role is more significant than that of an ordinary FBI agent, though likely less well-known than the one at issue in *Buendorf*, it seems reasonable to treat Plaintiff as a public officer who, by taking "governmental office[,] must accept certain necessary consequences of that involvement in public affairs." *Gertz*, 418 U.S. at 344, 94 S.Ct. 2997. However, given the limited availability of clear example or precedent to guide the Court's determination of whether Plaintiff was a public official, the stronger analysis lies in Plaintiff's status as a limited purpose public figure.

▬▬▬ The D.C. Circuit, drawing from *Gertz*, elaborated upon the characteristics of a public figure and further refined the test, as well as the parameters, by which public figures are to be defined. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir.1980). The *Waldbaum* court noted the creation in *Gertz* of two subclasses to the term "public figure:" (1) "persons who are public figures for all purposes" and (2) persons who are "public figures for particular public controversies." *Id.* at 1291. The former, a general public figure, is an individual holding a position of "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Id.* (quoting *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997). General public figures are "rare creature[s]," but the latter type of public figure—a "limited-purpose public figure"—is more common. *See id.* at 1292. A "limited-purpose public figure" is typically defined as "an individual (who) voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of is-

sues." *Id.* (quoting *Gertz*, 418 U.S. at 345, 351, 94 S.Ct. 2997) (internal quotations omitted) (parentheses in original). In delineating these categories of public and private figures, the Supreme Court has emphasized that the "peculiar circumstances of each case affect the balance between freedom of the press and an individual's interest in his reputation." *Id.* Following the Supreme Court's general directive to formulate "broad rules of general application," the D.C. Circuit adopted an objective, "reasonable-person" standard according to which courts in this Circuit should examine "the facts, taken as a whole," to determine, as a matter of law, whether an individual is a public figure. *See id.* at 1293.

Applying these definitions and an objective standard to the instant case, it is fairly plain from the outset that Plaintiff is not a general public figure. However, the question is much closer as to whether Plaintiff can be considered a limited-purpose public figure, who has been "drawn into a particular controversy." *Id.* at 1292. As a threshold matter, neither party disputes that the "Filegate controversy" was a public controversy, nor is there any dispute that Mr. Davis' comments were "germane to the plaintiff's participation in the controversy." *See id.* at 1298. Thus, all that remains of the public figure inquiry is for the Court to actually define Plaintiff's role in the public controversy.

▬▬▬ To play enough of a role in the controversy to be considered a limited-purpose public figure, an individual must have achieved a "special prominence" in the debate. *Id.* at 1297. The *Waldbaum* court offers two avenues through which an individual may attain this level of prominence: (1) the plaintiff either must have purposefully tried to influence the outcome or (2) could realistically have been expected, because of his position in the contro-

versy, to have an impact on its resolution. *See id.* The latter theory of involvement appears to apply more easily to Plaintiff's situation, the analysis of which is guided by "plaintiff's past conduct, the extent of the press coverage, and the public reaction to his conduct and statements." *Id.*

Still, applying the guidance in *Waldbaum* to Plaintiff's claim is not a simple task, in large part because the factors enumerated by the *Waldbaum* court are not particularly applicable to the circumstances of this case. For example, Agent Sculimbrene's access to the press, both prior to the relevant controversy and during the relevant controversy, was, at all times, circumscribed by his employment by the FBI. That is, by Plaintiff's account, "FBI procedures specifically prohibit Special Agents like me from having contact with the media unless authorized to do so and I had no such authority." *See* Pl. Opp. to Davis. Mot., Ex 1 (Sculim.Aff.) at 5. However, Plaintiff indicates that he did have a desire to respond in the media, and asked the FBI for permission to talk to the media himself, a request which the FBI denied. *See id.* Nonetheless, it appears that Agent Sculimbrene's actions, with regard to the Livingstone insert, were taken in conjunction with his official duties, and Agent Sculimbrene's public testimony was provided pursuant to either FBI request or subpoena. In addition, the parties fail to identify facts which indicate the nature of the public's reaction to Agent Sculimbrene's behavior or silence on the matter. Thus, the Court is left with what appears to be a somewhat atypical and complex case to analyze, even with the guidance of the *Waldbaum* opinion.

Perhaps the most useful guidance in *Waldbaum* is the court's simplification of the analysis which provides that "[i]n short, the court must ask whether a reasonable person would have concluded that this individual would play . . . a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy." *Id.* at 1298. Applying that standard to the facts of this case, it seems likely that a reasonable person would have expected Agent Sculimbrene to play a significant role in determining the "outcome of the controversy." *Id.* In this case, the "outcome of the controversy" relates to whether the First Lady, and thereby the President, would ultimately be held responsible for hiring Livingstone and consequently, for his alleged misuse of FBI files. *See* Davis Mem. at 24; Pl. Opp. to Davis Mem. at 24. In other words, it seems reasonable to expect that Agent Sculimbrene's statements implicating Hillary Clinton in the hiring of Livingstone would significantly impact the public's perception of the President and First Lady's involvement with the allegedly misused FBI files.

Moving on to the next step in the analysis, the conclusion that the alleged defamation relates to the Filegate controversy is a far easier one to reach. The statements made by Mr. Davis during the two television appearances in question relate directly to the Agent Sculimbrene's statements and the reliability of those statements. Mr. Davis did not speak about tangential or unrelated matters which might have been viewed as defamatory of Agent Sculimbrene. Thus, applying *Waldbaum's* simplified public figure test, it appears that Agent Sculimbrene can be considered to be a limited purpose public figure.

To provide further guidance on his own public or private status. Plaintiff invites the Court to examine the Eighth Circuit's opinion in *Price v. Viking Penguin, Inc.,* 881 F.2d 1426 (8th Cir.1989). *Price* involves statements published in a book about an FBI agent's "role in investigating the Wounded Knee occupation" and a

shootout on the Pine Ridge Reservation during which two FBI agents were killed. *See* 881 F.2d at 1429. With regard to the public or private status of the plaintiff in *Price,* the *Price* court "[did] not hesitate in agreeing with the district court that Price was a public figure and that the challenged statements relate[d] to his official conduct." *Id.* at 1431. Price, like Agent Sculimbrene, was "by no means the principal character" in a book nor the focus of that book, but "he was the object of public notoriety" and had been singled out for public criticism. *Id.* Also, as in the instant case, the events at issue and the plaintiff's conduct were discussed in news accounts and editorials. *Id.* Based on these facts, the *Price* court concluded that "[i]n context, criticism of the actions Price took in his official capacity reflect on the imperatives and conduct of the. FBI and the government generally, implicating the type of public debate at the core of the first amendment." *Id.* Accordingly, the Eighth Circuit deemed Price to be a "public figure."

The opinion in *Price,* though not binding precedent in this Court, is instructive, and tends to bolster the above *Waldbaum-*based analysis which leads to the conclusion that Agent Sculimbrene is, indeed, a public figure for purposes of the Filegate controversy. As with the allegedly defamatory statements in *Price.* Mr. Davis' statements relate solely to Agent Sculimbrene's official actions with respect to the Livingstone insert. Furthermore, Agent Sculimbrene, regardless of his willingness, ended up on the forefront of a very public controversy swirling around the propriety of actions taken by the President, the First Lady, and their staff. Debate related to this highly political controversy necessarily falls within the core of the protections afforded by the. First Amendment. To stifle such debate would likely thwart the intent which underlies the heightened

First Amendment protections articulated in *New York Times v. Sullivan* and its progeny. Accordingly, Plaintiff shall be treated as a limited purpose public figure for purposes of Defendant Davis' First Amendment defense.

Because Mr. Davis is entitled to the heightened protections afforded to speech related to public figures and officials under *New York Times, Co. v. Sullivan,* Plaintiff must carry the burden of proving that Mr. Davis' comments were made with "malice," meaning they were made with knowing or reckless disregard for the truth. *See New York Times,* 376 U.S. at 280, 84 S.Ct. 710. Contrary to Defendant Davis' assertion. Plaintiff's Complaint does allege action with "malice," although it is questionable whether the use of the term "maliciously" was intended to bear the legal meaning ascribed to malice in *New York Times. See* Complaint ¶¶ 155, 156 (alleging that "Defendants ... intentionally, maliciously, and wrongfully conspired"). Nonetheless, because the Court must construe Plaintiff's Complaint with all reasonable inferences in Plaintiff's favor, the Court cannot conclude Plaintiff failed to allege "malice." However, whether Plaintiff can survive the malice inquiry on a motion for summary judgment is a different matter.

■■■ In a defamation action, to survive a motion for summary judgment, the plaintiff must "show that the evidence in the record could support a reasonable jury finding by clear and convincing evidence that the allegedly defamatory statements were made with actual malice, i.e., with 'knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'" *McFarlane v. Esquire Magazine,* 74 F.3d 1296, 1301 (D.C.Cir. 1996) (quoting *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710) (brackets in original) (internal citation omitted). In order

to prove that a statement was made with reckless disregard for the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth" of his statements. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

 Plaintiff argues that "[Mr. Davis] knew or had every reason to know that his statements were false." *See* Pl. Opp. to Davis Mot. at 43. However, Plaintiff offers no concrete evidence in support of this assertion. In contrast, Mr. Davis, in his brief and in his televised statements, identifies the source or sources of his beliefs about Agent Sculimbrene. Turning first to statements in which he referred to Agent Sculimbrene as a "liar" and the like, Mr. Davis asserts that he had a "substantial factual basis" for his statements, namely the conflicts between the statements in the insert prepared by Agent Sculimbrene and the statements of Mr. Nussbaum, Hillary Clinton, and Gloria Livingstone. The statements of these individuals directly contradict the statements in the Nussbaum insert. That is, the Nussbaum insert states that Mr. Nussbaum told Agent Sculimbrene that Hillary Clinton had a relationship with Gloria Livingstone; Mr. Nussbaum denies making such a statement, and both Hillary Clinton and Gloria Livingstone deny having known each other in any context. In his appearance on *Crossfire*, on July 26, 1996, and in his appearance on *Rivera Live*, on August 2, 1996, Mr. Davis specifically refers to these contradictory statements in drawing his conclusions that Agent Sculimbrene is a "liar." *See* Def. Ex. 1 at 4; Def. Ex. 2 at 7, 9, 10. That these individuals have contradicted the statements of Agent Sculimbrene is undisputed. Moreover, these contradictions were reported in a story in the *Washington Post* on July 26, 1996. Given

that the facts underlying Agent Sculimbrene's statement were clearly in conflict, Mr. Davis' decision to believe the assertions of other individuals over those of Agent Sculimbrene and to conclude that Agent Sculimbrene's account was false cannot be shown to have been made with "malice." Said otherwise, Plaintiff does not offer any evidence to raise a material issue of fact as to whether Mr. Davis acted with knowing or reckless disregard of the truth. To the contrary, the facts underlying the subject of Mr. Davis' statements belie any such conclusion, as the "truth" was clearly in dispute.

Turning now to Mr. Davis' statements that Agent Sculimbrene had changed his story three times, Mr. Davis asserts, in his appearance on *Crossfire*, that Agent Sculimbrene's three statements on the Livingstone matter were not consistent. The Livingstone insert states that Bernard Nussbaum advised Agent Sculimbrene that David Craig Livingstone had "come highly recommended to him by Hillary Clinton, who had known his mother for a longer period of time ...." Complaint ¶ 23. In his testimony before the Senate Judiciary Committee, given on June 19, 1996. Agent Sculimbrene stated, without qualification, that William Kennedy, III, Assistant White House Counsel, was the one who had told him of a connection between Livingstone and Hillary Clinton. *See* Pl. Opp., Ex. 5 at 3 (lines 1-6). 4 (lines 15-16). On July 15, 1996, during a deposition before the House of Representatives' Committee on Government Reform and Oversight, Agent Sculimbrene testified that he was told, *by implication*, by William Kennedy, that Livingstone's mother knew Hillary Clinton. *See* Pl. Opp., Ex. 6 at 3. Based on the excerpts provided by Plaintiff, it does not appear that Agent Sculimbrene mentioned Bernard Nussbaum during his testimony given on June 19, 1996, or during his July 15, 1996, depo-

sition. *See* Pl. Opp. Exs. 5 and 6. In addition, Plaintiff insists that he has never wavered from the position that he does not recall the Nussbaum interview. *See* Pl. Opp. at 35. Plaintiff interprets these three statements as being entirely consistent. *See id.* However, it is not difficult to see how the statements might be interpreted as presenting three potentially conflicting accounts of what happened: (1) Nussbaum told Agent Sculimbrene of a connection between Mrs. Clinton and Livingstone's mother; (2) Bill Kennedy told Agent Sculimbrene that he was "stuck" with Livingstone because of a connection between Mrs. Clinton and Livingstone. (3) Agent Sculimbrene inferred from Bill Kennedy that there was a connection between Mrs. Clinton and Livingstone's mother. Given the perceptible changes in Agent Sculimbrene's three accounts of the alleged connection between Livingstone and Hillary Clinton, and the fact that Mr. Davis refers specifically to these differences, there appears to be a reasonable basis for Mr. Davis' statement that Agent Sculimbrene's story had changed three times, as well as his subsequent conclusion that the differences were an indication of a lack of credibility. In light of this reasonable basis, it does not appear that Plaintiff has raised a genuine issue of material fact as to whether Mr. Davis acted with malice, that is, with knowing or reckless disregard for the truth. Accordingly, Mr. Davis is entitled to summary judgment on Plaintiff's claims under Section 1985(1) and (2).

## IV. CONCLUSION

The Court has considered the relevant motion, opposition, reply, and any supplemental materials and, based on the foregoing analysis, the Court concludes that Defendant Davis' motion for summary judgment shall be granted because Plaintiff has failed to raise a material question of fact as to the issue of malice. An ap-propriate Order accompanies this Memorandum Opinion.

## ORDER

This case comes before the Court on Defendant Lanny J. Daivs' Motion to Dismiss or, in the Alternative, for Summary Judgment. Having considered Defendant Davis' motion, Plaintiff's Opposition thereto, Defendant's Reply, and any supplemental materials, for the reasons set forth in the accompanying Memorandum Opinion, it is, this 16 day of February, 2001, hereby

**ORDERED** that Plaintiff's Motion to Supplement his Opposition (# 86) is GRANTED; and it is likewise

**ORDERED** that Plaintiff's Motion to Strike (# 95) Defendant Lanny J. Davis' Opposition is DENIED; and is further

**ORDERED** that Defendant Lanny J. Davis' motion to dismiss (# 22–1) is DENIED; and it is further

**ORDERED** that Defendant Lanny J. Davis' motion for summary judgment (# 22–2) is GRANTED.

**SO ORDERED.**