PRESENT: Lemons, C.J., Goodwyn, Millette and Kelsey, JJ., and
         Russell and Koontz, S.JJ.

LAURA MARY-BETH PENDLETON
                                        OPINION BY
v.  Record No. 141116      SENIOR JUSTICE CHARLES S. RUSSELL
                                      June 4, 2015
MARCUS J. NEWSOME, ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Gregory L. Rupe, Judge

     This appeal arises out of an action to recover damages for

defamation in which the circuit court sustained a demurrer and

dismissed the complaint without leave to amend.  The dispositive

question is whether the complaint sets forth facts that, if

taken as true, are sufficient to support a cause of action for

defamation.  We therefore focus on the allegations contained in

the complaint.[1]

                          FACTS ALLEGED

     On January 2, 2012, Amarria Denise Johnson was a seven-

year-old first grade student at Hopkins Elementary School in

Chesterfield County.  Amarria died at the school that day as a

result of a severe allergic reaction to a peanut provided to her

by a classmate.

_____

     [1] The complaint is 34 pages long and with its attached
exhibits occupies 81 pages of the joint appendix to the record.
Consequently, we will, to some extent, paraphrase and condense
its content in the interests of brevity.

Amarria's mother, Laura Mary-Beth Pendleton (the plaintiff) brought this action in the Circuit Court of the City of Richmond against six defendants: Marcus J. Newsome, who was Superintendent of the Chesterfield County Public Schools (CCPS), Shawn Smith, who was Assistant Director of Community Relations for CCPS, Jody Enoch, who was a Public Health Nurse Supervisor for the Chesterfield County Health Department (CCHD), Tim Bullis, Director of Community Relations for CCPS, Ed Witthoefft, who was Assistant Superintendent of CCPS, and Patricia M. Carpenter, who was Chair of the Chesterfield County School Board (collectively, the defendants).

The plaintiff was a licensed practical nurse. She had informed the school staff earlier in the school year that Amarria was severely allergic to certain food products, including peanuts. The plaintiff had also, the prior year, filled out a confidential school "Standard Health/Emergency Plan" signed by Amarria's pediatrician. The plan directed that Amarria receive Benadryl and an auto-injection of Epinephrine if she should ingest or have skin contact with certain allergens, including nuts. As required by school regulations, the plaintiff also brought to the school an "EpiPen Jr." for the injection of Epinephrine for the school's use in such an emergency. The school's clinic assistant, however, told the plaintiff to retain it for use at home. The plaintiff

understood that the school maintained allergy medications for emergency use.[2]

On January 2, 2012, Amarria reported "bumps" and "scratching" in her neck shortly after ingesting the peanut but was not given either Benadryl or Epinephrine. She died soon thereafter.

The tragic death of the child received prompt and widespread publicity in news reports published by local, national, and international media. These reports contained many statements and comments made by the defendants.

The gravamen of the plaintiff's claim is that those statements were maliciously designed to divert public indignation from the failures of CCPS and CCHD personnel to exercise proper care for the child by falsely implying and insinuating that the plaintiff had failed to inform the school authorities of the child's serious allergy, failed to furnish a doctor-approved emergency medical plan, and failed to furnish the school clinic with the required medications for use in such an emergency. The plaintiff contends that the defendants' statements were designed to convey the innuendo that she bore

---

[2] The school's clinic assistant, specifically referring to the EpiPen Jr., told the plaintiff "we have everything we need here; you can take this one home in case you need it. [Amarria] will be fine," or words to that effect. The assistant then handed the EpiPen Jr. back to the plaintiff.

responsibility for the death of her child.  The complaint asserts:

> In the days following Amarria's death, when Ms. Pendleton was seeking answers to, and grieving from, the loss of her daughter, the Defendants undertook a public-relations smear campaign to deflect away from school and health officials, and onto Ms. Pendleton, responsibility for Amarria's death.  The Defendants falsely implied, inferred, and/or insinuated, through direct statements, omissions of relevant facts, and use of innuendo, that Amarria's death was caused by Ms. Pendleton's alleged inactions -- specifically, failing to provide necessary information and medications to Amarria's school.  In truth, as noted above, Ms. Pendleton had completed necessary paperwork and had provided Amarria's EpiPen Jr. to the Hopkins clinic assistant.  Defendants' false statements -- made by inference, implication, and/or insinuation -- caused Ms. Pendleton to be pilloried by the public.  Ms. Pendleton did attempt to explain her actual actions to the public.  Her single voice, however, was not heard above the chorus of false statements spread by the Defendants, whose falsities were bolstered by the Defendants' employment positions, and were repeated over and over in the media.  Persuaded by the Defendants' characterization of events, countless individuals, including the parents of other Chesterfield County Public Schools ("CCPS") students, concluded and declared that Ms. Pendleton was a bad mother -- the most hurtful and disparaging of labels.

STATEMENTS MADE BY THE DEFENDANTS[3]

In a public letter dated January 4, 2012 which was posted to CCPS's website on January 5, 2012, defendant Newsome stated:

> Student and staff safety is a top priority. . . . Earlier this week, a first-grade student at Hopkins Elementary School died. Chesterfield County Public Schools is deeply saddened by the loss of this child and has reached out to her family . . . . Key . . . is a parent's responsibility to provide the school with accurate, timely information; a health emergency plan . . . and the medicine necessary to execute the plan. . . . If any one of these items is missing, the doctor's orders cannot be carried out. The school . . . relies on parents to follow through.

In two emails dated January 4, 2012 responding to producers of major news organizations, Defendant Smith reiterated the CCPS statements, including "[e]xecution of the plan is dependent on the parent's ability to inform the school of needs and to provide the appropriate resources" and privacy protection "hampers our efforts to correct misinformation."

In a news article dated January 5, 2012 entitled "Grieving mom: School knew about peanut allergy," Smith was quoted as stating:

> Parents/guardians of a student with a severe allergy are key to the process of keeping their

---

[3] These statements are set forth as expressed in the complaint, including the emphasis given to the words the plaintiff contends are designed to convey a defamatory insinuation.

child safe at school. They are at the center of developing a plan that works for their child. Execution of the plan is dependent on the parent's ability to inform the school of needs and to provide the appropriate resources. When any or all of the resources are not provided, the public health nurse makes contact(s) with the family in an effort to obtain the necessary medication.

In an article dated January 5, 2012 entitled "Death of Allergic Student Raises Questions about School's Responsibility," Smith was quoted as stating:

> For any medication, the school would have to be in possession of [it] to provide it . . . . At the beginning of the school year, we sent information to parents outlining the different responsibilities for the family and the child . . . . First and foremost, it does begin at home. Working with their doctor, the family would outline a health care plan . . . .

In two articles dated January 5, 2012 entitled "Pupil, 7, who 'loved school' dies after suffering allergic reaction to peanuts during recess break" and "Family: Child dies in school from peanut allergic reaction," Smith was further quoted as stating "[a]t the beginning of the school year, we sent home a packet to the family, the understanding that there are certain students that have severe allergies."

An article dated January 6, 2012 entitled "Allergy kills Virginia girl at school," states that Smith gave a written statement stating "[w]hen any or all of the resources are not

6

provided, the public health nurse makes contact with the family in an effort to obtain the necessary medication."

In two articles dated January 5, 2012 defendant Enoch was quoted as stating "[p]arents need to provide all necessary medication their child needs to the school.  That is the responsibility of the parent."

In official email responses dated January 5, 2012 to concerned parents, defendant Witthoefft stated certain laws "can hamper our efforts to correct misinformation that is provided to and reported by local media outlets."  He further stated:

> Key to the plan is a parent's ability to provide the school with accurate, timely information; a health plan . . . and access to the medical resources necessary . . . . When the resources are not available, execution of the plan cannot be continued. Our school division welcomes medication . . . [EpiPens] are not prohibited . . . . Again, execution of the plan is dependent on the parent's ability to inform the school of needs and to provide the appropriate resources.  When any or all of the resources are not provided, the public health nurse makes contact(s) with the family in an effort to obtain the necessary medication . . . . [I]f one piece of the puzzle is missing, the doctor's orders cannot be carried out.

In an email response dated January 7, 2012 to a concerned parent, defendant Carpenter used the words "misinformation," "rumors," and "inaccurate information."  She said she appreciated the "opportunity to provide [her] with as many facts" as she could "at this time" and stated:

7

Key to the school division's plan to manage severe allergies is a parent's responsibility to provide the school with accurate, timely information; a health emergency plan . . . and the medicine necessary . . . If any one of these items is missing, the doctor's orders cannot be carried out.  If a student's health emergency plan calls for . . . medicine and it is not provided . . . the public health nurse contacts the family to obtain the necessary medication.  The school division relies on our parents to follow through and provide whatever is prescribed by the doctor in that plan . . . . these trained professionals have the best interests of our students in mind but <u>can only be effective if a parent provides information, doctor-prescribed health plans and the medicines necessary to carry out those plans. Unfortunately, this does not always occur</u>."

I hope . . . you will join us in our efforts to educate parents about their <u>important role</u> in providing us with information about allergies and the resources necessary to manage them.

Finally, in an article dated January 11, 2012 entitled "Fatal allergic reaction is a wake-up call," defendant Bullis was quoted as describing Amarria's death as a "wake-up call" for parents and stating that the plan requires parents to "provide accurate and timely information about their child's allergy, to provide a health action plan . . . and to provide access to the resources and medications . . . . <u>If any of those are missing, including medications, we can't execute the plan</u>."

8

ANALYSIS

We review a circuit court's ruling on a demurrer de novo. Webb v. Virginian-Pilot Media Companies, LLC, 287 Va. 84, 88, 752 S.E.2d 808, 811 (2014). The purpose of a demurrer is to determine whether the complaint states a cause of action upon which the requested relief may be granted. Welding, Inc. v. Bland County Service Auth., 261 Va. 218, 226, 541 S.E.2d 909, 913 (2001). A demurrer admits the truth of all properly pleaded material facts and all facts which are impliedly alleged, as well as facts that may be fairly and justly inferred. Cox Cable Hampton Roads, Inc. v. City of Norfolk, 242 Va. 394, 397, 410 S.E.2d 652, 653 (1991). In deciding whether to sustain a demurrer, the sole question before the trial court is whether the facts pleaded, implied, and fairly and justly inferred are legally sufficient to state a cause of action against a defendant. Id.; see also, e.g., Lewis v. Kei, 281 Va. 715, 719, 726-27, 708 S.E.2d 882, 887, 892 (2011); Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 713, 636 S.E.2d 447, 449 (2006).

> A common law complaint for libel or slander
> historically included three elements: the
> inducement, an explanation of the facts
> demonstrating that the allegedly defamatory
> statement is actionable; the colloquium, an
> explanation of how the allegedly defamatory
> statement refers to the plaintiff, if he is not
> explicitly named; and the innuendo, an

explanation of the allegedly defamatory meaning
of the statement, if it is not apparent on its
face.

Webb, 287 Va. at 88, 752 S.E.2d at 811 (citations omitted).

In determining whether the words and statements
complained of in the instant case are
reasonably capable of the meaning ascribed to
them by innuendo, every fair inference that may
be drawn from the pleadings must be resolved in
the plaintiff's favor.  However, the meaning of
the alleged defamatory language can not, by
innuendo, be extended beyond its ordinary and
common acceptation.  The province of the
innuendo is to show how the words used are
defamatory, and how they relate to the
plaintiff, but it can not introduce new matter,
nor extend the meaning of the words used, or
make that certain which is in fact uncertain.

Id. at 89-90, 752 S.E.2d at 811 (quoting Carwile v. Richmond

Newspapers, Inc., 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954)).

In Webb, we reiterated that Virginia law recognizes a claim

for defamation by inference, implication or insinuation, id. at

89 n.7, 752 S.E.2d at 811 n.7, but we made it clear that

ensuring that defamation actions proceed only upon statements

which may actually defame a plaintiff "is an essential

gatekeeping function of the court."  Id. at 90, 752 S.E.2d at

911.

We need not expound upon the fact that a statement falsely

implying that a mother was responsible for her child's death

10

would be defamatory.[4]  The issue before this Court is whether

such an implication is present.  Because Virginia law makes room

for a defamation action based on a statement expressing a

defamatory meaning "not apparent on its face," evidence is

admissible to show the circumstances surrounding the making and

publication of the statement which would reasonably cause the

statement to convey a defamatory meaning to its recipients.

Allegations that such circumstances attended the making of the

statement, with an explanation of the circumstances and the

defamatory meaning allegedly conveyed, will suffice to survive

demurrer if the court, in the exercise of its gatekeeping

function, deems the alleged meaning to be defamatory.  Whether

the circumstances were reasonably sufficient to convey the

alleged defamatory meaning, and whether the plaintiff was

actually defamed thereby, remain issues to be resolved by the

fact-finder at trial.

   In the present case, published news reports, attached as

exhibits to the complaint, indicate that in the days immediately

following the child's death, the case had been widely

publicized.  News accounts had identified the plaintiff by name

---

[4] For a thorough discussion of the elements of defamation in
Virginia, including the role of innuendo when the allegedly
defamatory meaning of a statement is not apparent on its face,
see Schaecher v. Bouffault, ___ Va. ___, ___ S.E.2d ___(2015)
(this day decided).

as the mother at the center of the case. In this context, it is clear that any defamatory implication proceeding from the defendants' statements was aimed directly at her and at no other person.

The circuit court overruled the demurrer upon first consideration. Later, the defendants moved for reconsideration based on our recent decision in Webb. The court then reversed its former ruling and sustained the demurrer. The court's reliance on Webb was misplaced. That case, also a claim for defamation by innuendo, was based on statements by a defendant that raised no implication that the plaintiff had acted wrongfully, and showed that it was just as likely that other persons were responsible for the allegedly improper conduct of which the plaintiff complained. Id. at 90-91, 752 S.E.2d at 812. In the present case, by contrast, the plaintiff was the sole and unmistakable target of any innuendo she may be able to prove to have resulted from the defendants' statements.

The context in which the statements were published includes the circumstances that the identity of the plaintiff was publicly known, that news media had heard her side of the story and had asked CCPS officials to comment on it, and had received responses from certain defendants to the effect that their efforts to "correct misinformation" were hampered by privacy laws. In that context, a fair and just inference would be drawn

12

that the plaintiff's version was "misinformation" but that the defendants, in laudable obedience to privacy laws, were unable to express the true version.

The defendants argue that their statements were true and the truth is a defense to a defamation claim.  The defendants' statements here, however, may be true if taken out of context, but in the context of the alleged publicity attending the case when the statements were published, it cannot be said at the demurrer stage that they were not capable of conveying the defamatory innuendo that the plaintiff bore responsibility for her child's death.

The defendants also argue that their statements were protected by the First Amendment.  Again, that position may be sound if the statements were read out of context, but a defamatory innuendo is no more protected by the First Amendment than is defamatory speech expressed by any other means.  See Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 504 (1984) (libelous speech is not protected by the First Amendment).

The United States Court of Appeals for the Fourth Circuit, in Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092-93 (4th Cir. 1993), a diversity case applying Virginia law, stated:

> [B]ecause the Constitution provides a sanctuary
> for truth, a libel-by-implication plaintiff
> must make an especially rigorous showing where

13

the expressed facts are literally true. The
language must not only be reasonably read to
impart the false innuendo, but it must also
affirmatively suggest that the author also
intends or endorses the inference.

(Citing White v. Fraternal Order of Police, 909 F.2d 512, 520

(D.C. Cir. 1990).)[5]  Our decisions in defamation cases do not

include a requirement that "a libel-by-implication plaintiff

must make an especially rigorous showing where the expressed

facts are literally true."  The plaintiff's burden is proof by a

preponderance of the evidence.  Food Lion, Inc. v. Melton, 250

Va. 144, 150, 458 S.E.2d 580, 584 (1995).  Nor have we held that

the defendant's words must, by themselves, suggest that the

author intends or endorses the allegedly defamatory inference.

Such a holding would immunize one who intentionally defames

another by a careful choice of words to ensure that they state

no falsehoods if read out of context but convey a defamatory

innuendo in the circumstances in which they were uttered.

Motive, intent, scheme, plan or design are issues of fact that

---

[5] In Chapin, the court considered a libel claim in which the
defendants were members of the press, the plaintiffs were public
figures, and the subject matter touched on matters of public
concern (controversy regarding involvement of American troops in
the Persian Gulf War).  In these circumstances, the court held,
"the constitutional protection of the press reaches its apogee."
Id. at 1092.  Here, by contrast, the plaintiff was not a public
figure, the defendants were employed by government agencies but
were not officials generally known, the publicity attending the
subject matter lasted only a few days, and the freedom of the
press is in no way impacted.

14

may be proved by circumstantial evidence as well as by direct evidence.  See Banovitch v. Commonwealth, 196 Va. 210, 216, 83 S.E.2d 369, 373 (1954) ("The specific intent may, like any other fact, be shown by circumstances.").

Because defamatory speech falls outside the protection of the First Amendment, a First Amendment analysis is inapposite in a case in which a plaintiff must allege and ultimately prove that the defendant intended his words to express a defamatory innuendo, that the words actually did so, and that the plaintiff was actually defamed thereby.

Assuming, as we must, the truth of all the facts properly pleaded by the plaintiff, and giving her the benefit of all facts implied and fairly and justly inferred from them, we conclude that in the context set forth in the complaint, the words ascribed to the defendants, given their plain meaning, are reasonably capable of conveying the defamatory innuendo of which the plaintiff complains.

The plaintiff also assigns error to the circuit court's denial of her motion to amend the complaint.  The proposed amendment included all matters originally pleaded, but added numerous email communications by the defendants tending to demonstrate their motivation and intent.  Our holding here renders that assignment of error moot.  On retrial, those

15

matters may be admissible, subject to the Virginia Rules of Evidence.

At trial, the plaintiff will bear the burden of proving, by a preponderance of the evidence: (1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply that the plaintiff was responsible for the death of her child, (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result.

CONCLUSION

Because the circuit court erred in sustaining the demurrer, we will reverse the judgment and remand the case for further proceedings consistent with this opinion.

_Reversed and remanded._